55 So.2d 587 (1951)
DORMAN
v.
T. SMITH & SON, Inc.
No. 19708.
Court of Appeal of Louisiana, Orleans.
December 10, 1951.
Rehearing Denied January 7, 1952.
*588 Deutsch, Kerrigan & Stiles, Breard Snellings, New Orleans, for defendant-appellant.
Sidney G. Roos, New Orleans, for plaintiff-appellee.
May & Carrere, New Orleans, for intervenor-appellee.
JANVIER, Judge.
The sole issue presented here is whether the doctrine of res ipsa loquitur is applicable. Just what caused the accident from which the suit results is not shown and therefore it cannot be said that the evidence shows that the defendant was at fault. Consequently, unless, by the doctrine of res ipsa loquitur, the burden of explaining the occurrence was shifted to the defendant, there is no liability. On the other hand, if, as a result of the doctrine, the defendant was placed under the necessity of showing that it was free from fault, it is liable because, as we have already said, the record does not disclose the cause of the occurrence.
Plaintiff, George J. Dorman, was in the employ of Alcoa Steamship Company, Inc., as a clerk. It was his duty on the day on which the accident occurred to check freight which was being unloaded from railroad cars and placed upon the river front wharf at New Orleans, to be later loaded into a steamship of Alcoa Steamship Company. The freight was being unloaded from railroad freight cars to a portion of the wharf which had been assigned by the Board of Commissioners of the Port of New Orleans (Dock Board) to Alcoa Steamship Company. The steamship company had entered into a written contract with T. Smith & Son, Inc., a stevedoring corporation, for the unloading from the various freight cars of the bags, packages, bundles and other freight which was later to be placed upon the steamship of Alcoa Steamship Company.
The particular commodity, which was being handled when the accident occurred, was tin plate, which was packed into flat bundles or bales and compressed. Each bundle was flat and had a surface area of approximately 4¼ feet, being 18 inches wide and 30 inches long. These packages were tightly bound by metal strips and, crosswise under each, there were three wooden skids, each about 1½ inches wide and about 4 inches high. These skids were fixed to wooden boards under the bales by nails, and the purpose of the skids was to raise each bundle about four inches from the floor so that each could be picked up by the lift machine, which was used in moving them from the boxcar to the wharf and in raising them to the various heights necessary for stacking. This lift machine was so constructed that its horizontal arms, which extended from its front, could be lowered to within a few inches of the floor *589 so that the machine might be brought alongside each bundle with the arms extended under the bundle and the arms could then be raised, the bundle moved, and either placed again upon the floor or stacked upon another bundle.
Quite a number of these bales or bundles of tin plate had been unloaded from the boxcar and had been stacked in tiers, three bundles high. The bundles varied in thickness so that, while the tops of all tiers were not exactly the same height, each tier was about 3½ to 4 feet high.
It was the duty of Dorman to check these bundles as they were placed upon the wharf, to see that none were missing or broken, and also to measure them to determine their cubic content, and to keep a record of their respective weights and sizes. The operator of the lift machine, an employee of T. Smith & Son, Inc., had stacked all of the tin plate, which had already been unloaded and placed upon the wharf, had placed in the particular stack which caused the accident one bundle weighing approximately 1,800 pounds on the floor of the wharf and had placed a second bundle weighing approximately 1,400 pounds on top of the first bundle, and had then placed a third bundle weighing approximately 1,800 pounds on top of the second. He had then driven his lift machine away from this stack of tin plate towards the boxcar and Dorman, the plaintiff, had measured these three bundles to determine their cubic content and had made a note thereof. Dorman had then turned his back toward the stack when suddenly, for some undisclosed reason, the top bundle slipped towards the end near which Dorman was standing, partially collapsed, and caused the partial collapse of the intermediate bundle also, with the result that the top bundle fell upon Dorman, causing the injuries from which this suit results.
Dorman brought the suit against T. Smith & Son, Inc., praying for judgment for $97,000, alleging that the accident had resulted from negligence of T. Smith & Son, Inc., had been negligent "in improperly stacking a skid or package of tin plate weighing 1800 lbs." He also alleged that the said employees of T. Smith & Son, Inc., had been negligent in improperly stacking tin plate "in a manner which permitted it to fall upon petitioner," and that the employees had violated rules of the Dock Board in stacking tin plate weighing almost 6,000 pounds in a space in which only 1,800 pounds should have been placed.
T. Smith & Son, Inc., filed exceptions of vagueness and no cause of action, and plaintiff then, by a supplemental and amended petition, alleged that, because the employees of T. Smith & Son, Inc., had stacked tin plate weighing nearly 5,000 pounds in a spot at which only about half that weight should have been stacked they were negligent, and that they were also negligent in that the said packages "were unsteadily packed one on top of the other, and that their weight was so great that being so improperly and unsteadily packed that the top one fell off the other two, either by the skids giving away and breaking, or because the weight of the said pile of tin plate was too great for the support of the wharf to properly support it, due possibly to vibration of the wharf, * *."
The Travelers Insurance Company intervened and alleged that it was the compensation insurance carrier of Alcoa Steamship Company; that it had paid to Dorman in compensation, or had paid for medical benefits $1,246, and that it would be liable for further compensation, and prayed for judgment against T. Smith & Son, Inc., for this amount and for such other amounts as it might be required to pay in the future.
T. Smith & Son, Inc., answered, admitting the occurrence of the accident, denying that any of its employees were at fault, and averring that the plaintiff, Dorman, was in complete charge of the unloading of the boxcars and in the placing of the bundles of tin plate on the wharf; that the lift machine and the operator thereof had been rented to Alcoa Steamship Company on an hourly basis, and that T. Smith & Son, Inc., "had parted with control over said machine and operator for the period of time said machine and operator was being used by said Alcoa Steamship Company."
There was judgment in favor of plaintiff for $10,000 and in favor of Travelers Insurance *590 Company for $1,736 and for $175 as attorney's fees. Defendant has appealed.
The contract between T. Smith & Son, Inc., and Alcoa Steamship Company is in the record, and from it we readily conclude that T. Smith & Son, Inc., agreed to unload and place the various portions of cargo on the wharf and that it cannot properly be said that T. Smith & Son, Inc., had merely rented its equipment and employees to Alcoa Steamship Company on an hourly basis.
On the other hand, we think that the record leaves no other conclusion than that the work of T. Smith & Son, Inc., was being done in accordance with instructions issued by Alcoa Steamship Company and, in spite of the denial of Dorman and certain other employees of Alcoa Steamship Company, we feel that the bales of tin plate were being placed where they were and were being stacked three bundles high because of instructions given by Alcoa Steamship Company to the employee of T. Smith & Son, Inc., who was operating the lift machine.
We cannot refrain from quoting from the evidence of Mr. W. E. Eckenbrecht, the Terminal Superintendent of Alcoa Steamship Company: "Q. Who tells the Belt Railroad where to stop (spot) the various freight cars? A. Alcoa Steamship Company, Inc., and its employees." Mr. Eckenbrecht also made the following significant statement: "* * * If for some reason or other it was not stacked properly and not high enough, or perhaps too high, in that case we would expect our clerk to so inform the car unloading foreman and/or us, ourselves."
Another witness, who at the time of the accident was in the employ of Alcoa Steamship Company, was Harold Helmker who was also a clerk doing the same kind of work as was being performed by Dorman. He gave the following testimony:
"Q. Now because of space saving it is the main reason you stack it? A. That's correct.
"Q. And that was true in 1947? A. That's correct.
"Q. Now who determines where the cargo from the boxcar is to be put? A. The trackwell, might say the track superintendent.
"Q. The Track superintendent? A. That's right.
"Q. Whom does he work for? A. Alcoa Steamship Company, Inc.

* * * * * *
"Q. This lift operator on the day of the accident he was a colored fellow? A. That's right.
"Q. Does that lift operator just put the cargo anywhere he wants to on the wharf? A. He does not.
"Q. Why not? A. He has to get instructions as to where he should put it.

* * * * * *
"Q. Isn't it true, Mr. Helmker, and that is all we want, that the Alcoa Steamship Company, Inc., clerk shows the lift man where to put the bundle of cargo when it is first put down? A. That's right."
Guy Irwin, another employee of Alcoa Steamship Company, who, at the time, was engaged in the same kind of work as was Dorman, testified as follows:
"Q. When the cargo is stacked who tells the colored lift operator how high to put it? A. If it is cargo we are not in the habit of handling usually the track man tells how he wants it put out.
"Q. You in turn tell the lift operator? A. Yes."
The "track man" was an employee of Alcoa Steamship Company.
The particular space on the wharf, which was being used by Alcoa Steamship Company, was allotted to that company by the Board of Port Commissioners (Dock Board), and it is conceded that space on the wharf was very valuable and that it was necessary that all cargo be properly stored on the wharf so as to conserve space and so as to be accessible when it was necessary to reload it onto a vessel.
We think it inconceivable that T. Smith & Son, Inc., and particularly that the laborer who was operating the lift machine, would have been permitted to place the cargo on the wharf without specific instructions, or that such an employee could have been permitted to determine just how high such merchandise should be stacked.
*591 It is shown that some thirty bundles had already been unloaded and stacked, each tier containing three bundles and that these had been checked by Dorman. The three bundles which caused this accident had also been unloaded and stacked, and Dorman had measured the tier and had noted its contents in his record book. He says that he saw nothing wrong with the stacking of those bundles. There is not one word to show that there was any vibration of the wharf, nor is there one syllable to show what caused the upper bundles to slip. The district judge says in his reasons for judgment that since the smaller package was in the middle, "this manner of stacking increased the possibility of their falling." We could well understand this if the surface area of the middle bundle had been substantially less than that of the top bundle for then the top bundle would have had to be carefully balanced, but the packages were all of the same surface area and the difference in weight was due merely to the fact that the middle bundle was a little thinner than the other two. We do not see that the fact that the middle bundle was thinner could possibly be pointed to as the cause of this occurrence.
As a matter of fact, no cause is shown for the falling of the two upper bundles. It is suggested, as a result of the examination of photographs taken after the occurrence, that at least one and possibly all three of the skids on the bottom of the middle bundle had pulled away from the boards to which they had been attached by nails, and that as a result the weight of the bundle had tilted the skids so that they turned over and allowed the bundle to slide towards the end. It is impossible to determine whether the pulling away of these skids from the bottom of the bundle was the cause or was the result of the occurrence. They might have become loosened in some unaccountable way prior to the stacking of the bundles so that, when the top bundle was placed above the second, the slight unevenness of weight of one end in excess of the weight of the other might have caused it to tilt the skids with the unfortunate result. If this was the cause, it obviously was not noticeable before the occurrence because both the employee of T. Smith & Son, Inc., and Dorman himself say that they saw nothing wrong with the top bundle when it was placed upon the second.
Another suggested possible cause is that certain wood fillers, which seem to be in the ends of each bundle for the purpose of making the bale even, may have turned over, with the result that one end of the bundle became thinner than the other and permitted the thicker portion of the bundle to slide towards the thin end. But there is not one word in the record to show that this occurred. This suggestion is based merely on the fact that the photographs show that such fillers were used in each bundle.
We therefore find ourselves at the exact point at which we began this opinion. There is no possibility of determining just what caused the accident and since this is true, there can be no recovery unless it be because of the effect of the doctrine of res ipsa loquitur.
Counsel for plaintiff, having failed to show affirmatively that in any of the particulars charged defendant's employees were at fault, relies heavily upon this doctrine.
It must be remembered that these packages did not belong to nor had they been prepared by the defendantthat corporation came into contact with them when it found them in the boxcars ready to be unloaded and stacked. If there was anything inherently wrong with them, the fault was not chargeable to the defendant since such fault could not be noticed by a visual examination.
They were unloaded and stacked, we think, under supervision of plaintiff, but if not under his supervision, certainly where he could and did see them and could determine as readily as could the employee of the defendant if there was anything wrong with one of them or with the manner in which they were stacked.
Why then should the doctrine of res ipsa loquitur be applicable? In a case in which we held that the doctrine was not applicable, Monroe v. H. G. Hill Stores, 51 So.2d 645, 651, we said: "There is not one word of affirmative proof of negligence on *592 its part, and certainly there is no room for the application of the doctrine of res ipsa loquitur. The bottles were stored in full view of the customers, and surely the customers would have just as much knowledge as to the cause of such a fall of the bottles as would the storekeeper. A customer standing immediately in front of such a `gondola' should be in a better position than any other person to know the cause of the fall of such a bottle."
In Davis v. Hines, 154 La. 511, 97 So. 794, 795, the Supreme Court said:
"The record fails to disclose any evidence of negligence on the part of the defendant in piling the flour. It is conclusively shown that it was piled in the usual and customary manner. Therefore, there is no basis for inferences in the case.
"The mere fact that a pile of sacks fell raises no presumption of negligence, and it is not a case for application of the doctrine of res ipsa loquitur."
As has often been said, the doctrine of res ipsa loquitur is not applicable unless the facts leave no room for any different presumption than that the defendant was negligent. The reasons for the application of the doctrine of res ipsa loquitur are set forth in the leading case on the subject, Lykiardopoulo v. N. O. & C. R. Light & Power Co., 127 La. 309, 53 So. 575. We discussed the reasons for the doctrine in Horrell v. Gulf & Valley Cotton Oil Co., 15 La.App. 603, 131 So. 709.
Since it is obvious that the fall of the tin plate may have resulted from any one of several causes, for no one of which would there have been liability in defendant, it is obvious that the doctrine of res ipsa loquitur is not applicable.
Consequently, since plaintiff has shown no particular fault on the part of defendant, there is no liability.
As a final contention counsel for plaintiff points to a certain clause in the contract between Alcoa Steamship Company, Inc., and T. Smith & Son, Inc., and, for some reason not disclosed by the record, also points to a clause in a contract entered into on September 1, 1938, between another steamship company, Ocean Dominion Steamship Corporation, and T. Smith & Son, Inc.
The clause in the contract between Alcoa Steamship Company, Inc., and T. Smith & Son, Inc., reads as follows: "7. Insurance: The Contractor agrees to carry and furnish evidence of carrying such insurance and include in the rates herein specified, Workmen's Compensation Insurance for the unlimited protection of its employees under State and Federal Laws, also Public Liability Insurance for the protection of third parties injured by its employees, such Public Liability Insurance to be in the amount of $250,000 for death or injury of one person and $250,000 for death or injury of more than one person in a single accident."
The clause in the contract between Ocean Dominion Steamship Corporation and T. Smith & Son, Inc., reads as follows:
"7. The party of the second part undertakes to comply with the provisions of the Longshoremen's and Harbor Workers' Compensation Act of March 4, 1927 [33 U.S.C.A. § 901 et seq.] and is to furnish the party of the first part with the proper certificate of compliance thereto. The party of the second part shall hold harmless the party of the first part against any claims for death or personal injury of or to the employees of the party of the second part engaged in work under this contract, whether such claim be for compensation or for damages, or for any matter or thing, and/or any third person when such death or injury occurs in or grows out of the loading and/or discharging or is in any way incident thereto.
"The party of the second part shall also hold harmless the party of the first part against any damage to the property of other persons, where such damage arises out of or is incidental to work under this contract."
We do not see that, as a result of either of these clauses, it can be said that whatever the circumstances the defendant has agreed to make itself liable whenever an employee of the steamship company sustains injuries. Our interpretation of these clauses is that they simply mean that if there is any fault or any legal liability on *593 the part of T. Smith & Son, Inc., as a result of which, liability may be placed upon Alcoa Steamship Company, Inc., then T. Smith & Son, Inc., will hold Alcoa Steamship Company, Inc. harmless and will procure insurance against such liability.
We cannot accept as sound the suggestion that the fact that defendant itself obtained insurance is an indication of a belief that it might be held liable for such an injury. Such insurance is obtained merely for the purpose of protecting the insured against loss where there is liability and cannot be accepted as creating liability which would not otherwise exist.
The judgment appealed from is annulled, avoided and reversed, and plaintiff's suit and the intervention of Travelers Insurance Company are dismissed at their cost.
Reversed.
REGAN, J., dissents.