686 So.2d 907 (1996)
Raymond STEWART, et al.,
v.
WINN DIXIE LOUISIANA, INC.
No. 96-CA-599.
Court of Appeal of Louisiana, Fifth Circuit.
December 11, 1996.
*909 Gregory G. Gremillion, Thomas W. Darling, Gretna, for Kleinpeter Farms Dairy, Inc.
William D. Grimley, Baton Rouge, for Raymond Stewart, et al.
Carlos E. Lazarus, Jr., Dixie C. Brown, Houma, for Winn-Dixie Louisiana, Inc.
Before GRISBAUM, WICKER and CANNELLA, JJ.
CANNELLA, Judge.
Defendant and Third Party plaintiff, Winn Dixie Louisiana, Inc. (Winn Dixie) and Third Party defendant, Kleinpeter Farms Dairy, Inc. (Kleinpeter) appeal from the judgment in this slip and fall case rendered in favor of plaintiffs, Raymond Stewart (Stewart) and his wife, Johanna, and holding Kleinpeter liable under an indemnification agreement. For the reasons which follow, we affirm on the liability and damages issues and reverse and render on indemnification..
On November 22, 1993, Raymond Stewart was injured when he slipped on a broken egg and fell to the floor of the Winn Dixie Store located on West Main Street in Gramercy, Louisiana. At the time of the accident, Stewart was employed by Kleinpeter as a route delivery man. This Winn Dixie store was part of his route and he was in the course and scope of his employment at the time of the accident. Stewart arrived at the store around 7:40 a.m., entered and walked down aisle one, where the fall later occurred. He walked to the dairy case to determine the amount of milk products the store needed. He was entering information into his hand held computer on his way down the aisle. He removed the out-of-date items from the dairy case and headed back to the front of the store and back to his truck. He estimated that this trip from and back to his truck took approximately ten minutes. He did not see any egg on the floor at this time, but he remembered that there were numerous displays on the aisle on that particular day. The co-manager, Paul Bourgeois, confirmed that it was common to have a number of displays at Thanksgiving time.
A computer generated printout, showed the time which Stewart returned to his truck as 7:49 a.m. He then proceeded to fill his order from the rear of his truck, loading his dolly with four to five crates of milk products. Stewart reentered the store to checkin the merchandise with the store computer. The Winn Dixie computer generated a ticket showing the time as 8:08 or 8:09 a.m. This indicates that twenty minutes elapsed from the time Stewart returned to his truck and the time he reentered the store. He then waited to be checked-in by Paul Bourgeois.
*910 Thereafter he proceeded to the milk section where he shelved the merchandise, straightened up the Kleinpeter products area, stacked the crates on his dolly and turned to leave the store. As he proceeded down the aisle, some twenty feet away, he passed the egg section and slipped and fell on a broken egg that was on the floor. An ambulance was called at 8:29 a.m.
When Stewart fell, his back and head hit the floor. He tried to catch himself and he landed with his shoulder and right arm underneath him. His primary injuries were to his low back and right wrist.
Stewart filed suit against Winn Dixie and Kleinpeter intervened for reimbursement of funds it paid to Stewart as worker's compensation benefits. Winn Dixie filed a third-party demand against Kleinpeter, alleging that Kleinpeter had entered into an indemnity agreement with Winn Dixie, whereby Kleinpeter agreed to indemnify Winn Dixie for any damages owed to a Kleinpeter employee. Kleinpeter and Winn Dixie agreed to sever the indemnity third party demand from the liability proceedings between Stewart and Winn Dixie. Trial was held on August 9 and 10, 1995. At the conclusion of trial, the trial court requested memoranda and took the matter under advisement. The third party demand came back before the trial court on motions for summary judgment filed by both sides.
Judgement was rendered on February 14, 1996 on the entire case. The trial court rendered judgment in favor of Stewart and against Winn Dixie in the amounts of $330,000 general damages and $298,496 for lost wages. Mrs. Stewart was awarded $20,000 against Winn Dixie for loss of consortium. The trial court awarded Kleinpeter reimbursement of $57,617.33 against Winn Dixie for medical expenses it had paid on behalf of Stewart. The trial court also awarded Kleinpeter, against Winn Dixie, reimbursement for any weekly compensation benefits it had paid or would pay. The trial court also ruled on the summary judgment motions, denying Kleinpeter's and granting Winn Dixie's, thereby holding that Kleinpeter must indemnify Winn Dixie per their agreement. It is from this judgment that Kleinpeter and Winn Dixie appeal and plaintiffs answered their appeals requesting an increase in the general damage award.
The issues on appeal fall into two categories, whether the trial court erred in its assessment of liability and quantum and whether the trial court erred in holding that the indemnity agreement between the parties required Kleinpeter to indemnify Winn Dixie for its own negligence. The resolution of the first issue could render the second issue moot.
Kleinpeter and Winn Dixie argue on appeal that the trial court erred in not finding that Stewart was comparatively at fault in causing the accident and that the damage award was excessive. Winn Dixie also argues that the trial court erred in finding that it was at fault at all.
Plaintiffs, of course, argue that the trial court judgment was correct concerning liability and quantum or, if anything, the award was too low, and argue that defendants cannot show, based on the case record, that the trial court judgment was manifestly erroneous in any respect.
It is well settled that, on appellate review of a factual determination, the reviewing court may not set aside the findings of fact in the absence of manifest error or unless they are clearly wrong. Also, where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring, 283 So.2d 716 (La.1973). The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Stobart v. State through DOTD, 617 So.2d 880 (La.1993). Thus, where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, supra. When findings are based on determinations regarding the credibility of witnesses, the manifest error or *911 clearly wrong standard demands great deference to the trier of fact's findings, because only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Canter, supra at 724; Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825, 826 (La. 1987); Boulos v. Morrison, 503 So.2d 1, 3 (La.1987); Williams v. Keystone General Contractors, Inc., 488 So.2d 999, 1001 (La. 1986); Johnson v. Insurance Co. of North America, 454 So.2d 1113, 1117 (La.1984); Berry v. Livingston Roofing Co., 403 So.2d 1247, 1249 (La.1981); Crump v. Hartford Accident & Indemnity Co., 367 So.2d 300, 301 (La.1979).
The fact finder in this case was a judge, from whom we have the benefit of extensive, well-written reasons for his judgment, finding Winn Dixie 100% at fault in causing Stewart's accident. He made several important factual findings among which, concerning credibility, he found plaintiff's testimony to be "straightforward and unembellished".
The trial judge found that Clarence Webre, the Winn Dixie employee who had the responsibility of checking the aisle where the accident happened, arrived at the store at 6:00 a.m. and walked down the aisle at that time. He did not walk down the aisle again until after the accident happened, more than two hours later. As part of his zone check he was supposed to check the aisles every thirty minutes. Instead of walking down the aisle, he stood at the end of the aisle and looked down it. The aisle was sixty feet, six inches long and contained more floor displays than usual because of the Thanksgiving holiday displays. The trial judge found that distant observation down the aisle was difficult. Further, the trial court found that the floor on the aisle was multicolored, with blue, yellow and white striping, also making observation of items on the floor difficult. The egg upon which Stewart slipped overlapped the yellow and white floor stripes.
The trial court further found that the dolly which Stewart was pushing at the time of the accident was six feet tall and came to his chest when being pushed. The trial court noted that there was conflicting testimony between Stewart who testified that he could not see over the dolly when filled with the milk crates and the co-manager Bourgeois who agreed with Stewart in deposition but testified at trial that after conducting a test found that he could have seen the egg over the dolly. The trial court resolved this conflict by concluding that Bourgeois may have seen the egg because he knew it was there. However, he found that the dolly and the crates, coupled with the floor displays and multicolored floor tiles hampered the plaintiff's ability to observe the egg on the floor. Another Winn Dixie employee who had been buffing the floors passed down the aisle where the accident happened just minutes before the accident. This employee was not called to testify. The trial court concluded that the egg was probably on the floor prior to 8:00 a.m. and that both Webre and the floor buffer had an opportunity to observe the broken egg prior to the accident and both failed to do so, or did nothing about it prior to the accident.
Winn Dixie, in arguing against their liability, does not dispute the factual determinations as much as they argue against the legal conclusions that were derived from those facts. Winn Dixie does, however, argue that the court erred in concluding that the egg was on the floor prior to 8:00 a.m. This factual dispute is relevant to Winn Dixie's argument that the trial court erred in finding that Winn Dixie had constructive knowledge of the egg spill.
The burden of proof in an action against a merchant is set out in La. R.S. 9:2800.6[1] which provides:

*912 A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, and in addition to all other elements of his cause of action, that:
(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable;
(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence; and
(3) The merchant failed to exercise reasonable care.
C. Definitions:
(1) "Constructive notice" means the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care.
(2) "Merchant" means one whose business is to sell goods, foods, wares, or merchandise at a fixed place of business.
D. Nothing herein shall affect any liability which a merchant may have under Civil Code Arts. 660, 667, 669, 2317, 2322 or 2695.[2]
Thus, under this provision, the legislature placed the burden on the plaintiff to *913 prove that the merchant breached his duty of reasonable care in that a condition existed that presented an unreasonable risk of harm, that the merchant either created the condition or had actual or constructive notice of the condition and that merchant failed to exercise reasonable care.
Winn Dixie does not take issue with plaintiff's proof as to the first prong, i.e., that the condition presented an unreasonable risk. Obviously, a broken egg, which is extremely slippery, on the floor in a grocery, presents an unreasonable risk of harm. However, Winn Dixie contends that it did not create the condition, that it did not have actual or constructive notice of the condition and that it did not fail to exercise reasonable care.
The trial judge, after hearing all of the evidence, applied the law and concluded that Winn Dixie did create or contributed to the creation of the condition by placing the canned biscuit display above the egg display with full knowledge that the cans of biscuits sometimes roll down onto the eggs causing them to break. Further the court concluded that Winn Dixie contributed to the unreasonably dangerous condition by maintaining the multicolored tile floor which made spills more difficult to detect. Additionally, the trial court found that Winn Dixie had actual or constructive notice of the condition prior to the accident, that the floor buffer had just been down the aisle shortly before the accident and either disregarded the spill or didn't see it, that the inspection procedures were inadequate, at least on the day of the accident, in that the employee, whose job it was to walk down the aisles had not walked down this aisle in over two hours, but instead made aisle checks by walking down the end of the aisle and looking down the sixty foot long aisle that contained numerous displays. The trial court concluded that the length of the aisle, coupled with the multicolored tile floor and the numerous Thanksgiving displays made checking the aisle by looking down it from the end grossly inadequate under the circumstances.
Upon our review of this record, we cannot conclude that the trial court judgment was clearly wrong or manifestly erroneous. While cognizant of our responsibility to review facts, we are also well aware that under the appellate standard of review we are not to substitute our view of the facts for that of the trier of fact, absent a finding of manifest error. The record herein contains sufficient evidence from which the trial court could have reasonablely concluded that Winn Dixie either created the hazard or had actual or constructive notice of the hazard created by the broken egg on the floor and that it did not act with reasonable care.
"Whether the merchants protective measures were reasonable `must be determined in light of the circumstances of each case, along with the risk involved, the merchant's type and volume of merchandise, the type of display, the floor space utilized for customer service, the volume of business, the time of day, the section of the store, and other such considerations.' Saucier v. Kugler, Inc., 628 So.2d 1309, 1312, citing Castille v. Great Atlantic & Pacific Tea Co., 591 So.2d 1299 (La.App. 3rd Cir.1991) and Johnson v. Wal-Mart Stores, Inc., 616 So.2d 817 (La. App. 2nd Cir.1993)." Welch v. Winn-Dixie Louisiana, Inc., 94-2331 (La.5/22/95) 655 So.2d 309.
In Welch, supra, the Supreme Court addressed the effect of La. R.S. 9:2800.6, as amended in 1990, on a plaintiff's burden of proof in a slip and fall case. In reversing the court of appeal and reinstating the trial court judgment in favor of plaintiff, the Supreme Court recognized the increased burden on plaintiff established by La. R.S. 9:2800.6. The court cited approvingly the Court of Appeal's opinion that the effect of the 1990 amendment to La. R.S. 9:2800.6 was to revert to the burden of proof in slip and fall cases that predated Kavlich v. Kramer, 315 So.2d 282 (La.1975), which had increased defendant's burden of proof in slip and fall cases. A presumption of defendant's negligence arose once plaintiff established that a dangerous condition on the merchant's premises had caused plaintiff's injury. The burden then shifted to defendant to produce evidence to exculpate itself from the presumption of negligence.
The pre-Kavlich burden of proof, although placed on plaintiff, was not, however, impossible *914 to meet. In Hay v. Sears, Roebuck & Company, 224 So.2d 496 (La.App. 3rd Cir. 1969) the court concluded that the store had constructive knowledge of the dangerous condition where cans were stacked in the aisle for approximately thirty minutes.
In Fontanille v. Winn-Dixie Louisiana, Inc., 260 So.2d 71 (La.App. 4th Cir.1972) the court found that defendant's failure to provide reasonable and adequate cleanup and inspection procedures rendered it liable. The Court of Appeal concluded that had defendant adopted a reasonable program of maintenance in clearing passageways, it would have discovered the foreign substance on the floor.
Likewise, in Estrade v. Winn-Dixie Stores, Inc., 286 So.2d 686 (La.App. 4th Cir. 1973) the court held defendant liable where the foreign substance remained on the floor for a period of time and the store lacked a definite and systematic program for discovery of such substance.
In considering the burden of proof required after the 1990 amendment to La. R.S. 9:2800.6, this court in Parker v. Winn-Dixie Louisiana, Inc., 615 So.2d 378 (La.App. 5th Cir.1993) held defendant liable where there was testimony that no one had inspected the aisle five to ten minutes before the accident occurred and that defendant had no knowledge of the last time that the aisle had been inspected prior to the accident.
In Saucier v. Kugler, Inc., 628 So.2d 1309 (La.App. 3rd Cir.1993) the court ruled in favor of plaintiff who slipped on a lemon, where the defendant knew that the lemon display was such that the lemons would often fall to the floor and the store had no policy of how inspections were to be conducted, with the employees having the discretion to either walk or simply look down the aisle.
In each of these cases the slip and fall plaintiff came forward with some positive evidence showing that the hazardous condition was either known by the merchant or existed for such a period of time that the merchant should have discovered its existence.
Likewise, in the instant case, plaintiff came forward with proof, as found by the trial judge, that the merchant knew that the biscuits fell on the eggs and caused them to break. The multicolored tile floor made it difficult to see spills. There were an unusual number of displays in the aisle because of the Thanksgiving holidays. The clean-up procedure had not been followed on the day in question where the employee who was to inspect the aisle had not walked down the aisle in over two hours. Accordingly, we find no manifest error in the trial court finding that plaintiff met his burden under La. R.S. 9:2800.6 in establishing Winn Dixie's liability.
Next it is argued that the trial court erred in finding that plaintiff was free from fault in causing the accident. Defendants contend that Stewart failed to exercise reasonable care under the circumstances. They argue that plaintiff is responsible for injuries caused by hazards observable with the exercise of reasonable care.
This court, in Falgoust v. Richardson Indust., Inc. 552 So.2d 1348 (La.App. 5th Cir.1989) addressed appellate review of determination of allocations of fault stating:
Allocation of fault in comparative negligence cases is a factual determination to be made by the trier of fact. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985); Brightman v. Regional Transit Authority, 543 So.2d 568 (La.App. 4th Cir.1989). As with all factual determinations, such findings cannot be reversed unless the record discloses that they are clearly wrong or manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The question then is whether, after a complete review of the record, there is sufficient evidence to support the trial court finding that Stewart was free from fault. We find that there clearly is.
The trial court made the factual determination that Stewart could not see the egg while pushing the six foot dolly loaded with milk crates. Although Bourgeois testified at trial that in a test he conducted with a dolly he could see eggs on the floor, he had twice testified in depositions that he did not think Stewart could see the egg. Further as pointed out by the trial court, in Bourgeois' *915 "test" he himself had put the egg down and knew where to look for it. Moreover, the trial court made the additional finding that the multicolored nature of the floor made it difficult for a person to see spilled products. When those facts are combined with the distracting nature of the numerous displays, regardless of whether Stewart was a customer or not, we find ample evidence in the record to support the trial court's finding that Stewart f/was free from fault. We find no manifest error in this determination.

QUANTUM
Defendants argue that the damages awarded by the trial court in favor of plaintiff are excessive. The trial court awarded Stewart $300,000 in general damages for the back injury, $30,000 in general damages for the wrist injury and $298,496 in lost wages. The trial court also awarded Mrs. Stewart $20,000 for loss of consortium.
The Supreme Court has recently addressed the appropriate appellate standard of review for a general damage award in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). Therein the court, after noting how difficult it was to express the proper standard of review, stated:
Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Thus, a two step process emerged for appellate review of a general damage award. First, the appellate court must determine whether there has been an abuse of the fact finder's wide discretion in determining the amount of general damages. Then, if the appellate court found such an abuse of discretion, it should examine prior awards of general damages for similar injuries to determine the greatest or least amount that the fact finder could have reasonably awarded, and either raise or lower the award to that extent. Theriot v. Allstate Ins. Co., 625 So.2d 1337 (La.1993); Youn v. Maritime Overseas Corp., supra.
In reviewing this case, with respect to the first of the two steps mandated by the Youn and Theriot cases, we find that the trier of fact, the trial judge, has not abused his vast discretion in determining the amount of general damages and the award for loss of consortium.
As a result of the accident, Stewart injured both his lower back and his right wrist. Stewart was originally taken to the emergency room by ambulance where he was treated and released. He thereafter sought treatment from Dr. Richard Robichaux, who treated him conservatively at first, with pain medication and physical therapy but the back and wrist pain persisted. Stewart then consulted a neurosurgeon, Dr. Thomas Perone. X-rays revealed grade two spondylolisthesis with entrapment of the L5 nerve root. On April 21, 1994, Dr. Perone performed surgery on Stewart, lasting between nine and ten hours, consisting of a decompressive laminectomy with fusion of L4-S1 using pedicle screws and rods and a bone graft to immobilize the spine. Following the surgery, Stewart remained in the hospital for nine days. He started therapy on the sixth or seventh day following the surgery. On his first trip to therapy he attempted to stand and the pain was so severe that he became nauseated. He wore a body brace for several months following the surgery.
During his first month at home, he could not get out of bed, go to the bathroom or bathe without assistance. He was experiencing extreme pain. Several months following the surgery he began therapy at Baton Rouge Physical Therapy. He went there three times a week for several weeks and the therapy caused pain in his lower back.
It was Dr. Perone's opinion that Stewart could not go back to work delivering milk, *916 but could only do sedentary work hereafter. He can only lift weight of less than twenty-five pounds and he cannot do any climbing. Dr. Perone testified that, as a result of the injury, Stewart has a 30 % permanent partial anatomical disability, combined with a 45% disability of his right wrist.[3]
Stewart testified that he continues to have pain in the lower parts of his back and in his wrist, finds that he is unable to stand or ride in a car for long periods of time and has not worked since the accident. His wife was forced to take on a second job. All of this has effected his relationship with his wife. Their sex life is limited because of his physical limitations and financial problems have caused many arguments.
While it is true that Stewart suffered a prior back injury which required surgery, there was evidence that he made a full recovery and had returned to work without restriction. He was rated with a 15% disability but it did not interfered with any activities. He enjoyed hunting, fishing, weight lifting, horseback riding and jogging. Since this accident he cannot do any of those activities anymore except for the fishing under certain conditions.
Thus, based upon our review of the record under the Youn and Theriot standards of review, we cannot say that the trial judge abused his vast discretion as to the general damage award or the loss of consortium award.
In reaching the damage award, the trial court made reference to several cases in the $300,000 range. Both defendants take issue with the cases cited and argue that they were erroneously relied upon because they are not sufficiently similar to the case at bar. Both defendants cite cases in their briefs which they argue present injuries more similar to Stewart's than the cases relied on by the trial court and in those cases the general damage award was in the $150,000 to $200,000 range. Stewart, cited cases with awards reaching $450,000. However, under the Youn and Theriot two prong process of appellate review of damage awards, because we found under the first prong that the trial judge did not abuse his discretion, we do not reach the second step of comparing the general damages determination in this case to that in past cases of similar injuries. Accordingly, under the facts of this case, we find no error in the general damage award or the loss of consortium award set by the trial court.
Next defendants argue that the trial court erred in awarding Stewart $298,496 in lost wages. In their 11 line argument on this issue defendant Kleinpeter argues that the record does not support the trial court award because Stewart was working at an hourly rate of $6.23 when injured and it was assumed that he could return to the job market at a rate between $6.00 and $7.00 per hour. Thus, it is argued, that Stewart has suffered no loss of income.
After reviewing the testimony of Dr. Rice, we find defendants' argument evidences a complete misunderstanding of the testimony or intentional misrepresentation of it. Dr. Rice testified that the present value of Stewart's lost future earnings, if he never worked again, was $483,642. He arrived at that figure by taking Stewart's average monthly wage of $2,200 and multiplying it by his future work life expectancy of 26.96 years. An inflationary factor of 3 1/2% and a discount rate of 6.6% were used. Then Dr. Rice calculated what Stewart would earn if he returned to work at $6 per hour for a forty hour week and reached a figure of $228,631. Dr. Rice subtracted the latter sum (what Stewart could earn at $6 per hour) from what the total lost wages and obtained the difference of $255,011. Dr. Rice testified that Stewart's past lost wages equaled $43,485, which was not contested. In adding the past lost wages of $43,485 to the future lost wages of $255,011, he arrived at the sum awarded by the trial court, $298,496.
The fallacy in Kleinpeter's argument is that, prior to the accident, Stewart worked approximately eighty hours per week. Thus, even though he worked at the rate of $6.23 per hour before the accident and his lost *917 wages were calculated with him returning to work at $6 per hour, that was for a forty hour week not an eighty hour week. The difference, as testified to by Dr. Rice, with inflationary factors and discounting equals, $255,011, as awarded by the trial court.
On cross examination of Dr. Rice, defendants elicited testimony from him that, if Stewart returned to work at $12 per hour he would suffer virtually no lost wages. However, defendants did not present evidence concerning the likely prospect of that happening or within what time frame that might happen. Considering the fact that Stewart had a manual labor job before the accident, which he cannot perform now because of his disability, and his low average score on the verbal and nonverbal intelligence test, it does not seem probable that Stewart would return to the job market at almost twice what he was earning before the accident. Two vocational rehabilitation experts testified that Stewart would likely return to the job market earning between $5 and $7 per hour.
Therefore, we find ample evidence in the record to support the trial court judgment awarding Stewart lost wages, both past and future, in the amount of $298,496.

INDEMNITY
On October 8, 1990, Kleinpeter and Winn Dixie entered into an indemnity agreement which provides, in pertinent part:
Agreement made this 8th day of October, 1990, by the undersigned as Indemnitor [Kleinpeter] and Winn-Dixie, Inc. and its subsidiaries, referred to as Indemnitee.
In consideration of your permitting us or our servants, agents, employees and representatives to enter upon or to place, maintain or service equipment or products upon premises owned or controlled by you. [sic] Indemnitor agrees to indemnify and hold Indemnitee harmless from any claim or loss arising in any manner our [sic] of the presence or activity of the undersigned or any of our servants, agents, employees and representatives or our equipment or products.
We also agree to indemnify and hold you harmless from any claim or loss arising in any manner from the presence of our equipment or product or our service, or damages or injury to persons or property due to any negligence or act of us or our employees, agents or representatives.
Both parties filed motions for summary judgment regarding liability under the indemnity agreement. The trial court denied Kleinpeter's motion and granted Winn Dixie's motion, ruling that Kleinpeter was obligated to indemnify Winn Dixie for Stewart's damages. Kleinpeter appealed from this part of the trial court judgment.
On appeal Kleinpeter argues that the trial court erred in ruling that Kleinpeter owed Winn Dixie indemnity for Winn Dixie's own negligent acts. Rather, Kleinpeter argues that a contract of indemnity will not be construed to indemnify an indemnitee against losses resulting through its own negligent acts unless such intention is expressed in clear and unequivocal terms. This contract of indemnity does contain some broad and general terms, but does not express clearly what the law requires.
Winn Dixie argues that the trial court was correct in its interpretation of the indemnity agreement in that the agreement provides indemnification for "any claim or loss arising in any manner" which would include the instant case. Note the broad and general language, but not the clear and express wording required by the cases.
In reviewing a trial court judgment on a motion for summary judgment, the de nova standard of review is utilized. Schroeder v. Board of Supervisors, 591 So.2d 342 (La.1991). The general rules which govern the interpretation of other contracts apply in construing a contract of indemnity. Soverign Ins., Co. v. Texas Pipe Line Co., 488 So.2d 982 (La.1986). When a contract is unclear it is to be interpreted against the party who furnished the text. La. C.C. art. 2056. A contract of indemnity whereby the indemnitee is indemnified against the consequences of his own negligence is to be strictly construed. Perkins v. Rubicon, Inc., 563 So.2d 258 (La.1990); Soverign Ins., Co. v. Texas Pipe Line Co., 488 So.2d 982 (La. 1986); Polozola v. Garlock, 343 So.2d 1000 (La.1977). Such a contract will not be construed *918 to indemnify an indemnitee against losses resulting to him through his own negligent acts unless such an intention is expressed in unequivocal terms. Perkins v. Rubicon, supra; Soverign Ins., Co. v. Texas Pipe Line Co., supra; Polozola v. Garlock, supra. The purpose of the indemnity agreement is to allocate the risks inherent in the activity between the parties to the contract. Perkins v. Rubicon, supra; Thus, in interpreting the contract, we must determine whether the risk that resulted in the injury was one contemplated by the parties to the contract. To be contemplated by the parties, the cases say that it must be expressed by them.
The risk that resulted in injury in this case was that of a Kleinpeter employee being injured as the sole result of Winn Dixie's negligence. Therefore we must determine whether the indemnity agreement entered into by Kleinpeter and Winn Dixie provided indemnification to Winn Dixie for damages it became obligated to pay Stewart, a Kleinpeter employee, as a result of Winn Dixie's own negligent act. We find no such unequivocal expressions in the indemnity agreement of an intent on the part of Kleinpeter to indemnify Winn Dixie for its own negligent acts.
In ruling in favor of Winn Dixie, the trial court relied on three cases: Perkins v. Rubicon, 556 So.2d 1272 (La.1990); Couvillion v. Shelter Mutual Insurance Company, 95-1186 (La.App. 1st Cir. 4/4/96) 672 So.2d 277; and Wallace v. Helmer Directional Drilling, Inc., 600 So.2d 142 (La.App. 3rd Cir.1992). None of these case, nor does the jurisprudence as a whole, support Winn Dixie's interpretation of the indemnity agreement.
In the Perkins case, Barnard & Burk Plant Services, Inc. (B & B), a maintenance service company, entered into a contract with Rubicon, Inc., the owner of an industrial plant, to provide maintenance services at the plant. As part of the contract between the parties, they entered into an indemnity agreement that provided that B & B would "indemnify and hold [Rubicon] harmless from all claims, suits, actions, losses and damages for personal injury, including death and property damage, even though caused by the negligence of [Rubicon], arising out of [B & B's] performance of the work contemplated by this agreement." (Emphasis provided.) The court concluded, based on this express language, that the parties clearly intended that B & B would assume responsibility for injuries caused by the negligent acts of the employees of Rubicon.
In Couvillion, PALA, Inc, a contractor, performing work on a turnaround at the Borden chemical plant, had entered into an indemnification agreement with Borden that provided in pertinent part:
[PALA] agrees to indemnify, defend and save [Borden] ... harmless from and against any and all claims, suits and liabilities based upon ... injury to any person (including death) arising out of or attributable to the presence of [PALA], its employees, subcontractors or agents ... upon the premises of [Borden] or the performance or non-performance by [PALA] ... of the work to be performed ... including but not limited to injuries or damages caused solely or in part by the negligence of [Borden]. (Emphasis provided.)
Although not an issue in the case, this indemnity contract clearly and expressly provided language the indicated the parties' intent to include indemnification for Borden's negligent acts.
In Wallace, Canco Services (lessee) was leasing office space from Canco Realty (lessor) when plaintiff, lessee's employee, slipped and fell. In plaintiff's suit against lessor, lessor filed a third party demand against lessee for indemnification. The court found as follows:
The lease between Realty [lessor] and Services [lessee] is unambiguous. It is clear from the terms of the lease that Services agreed to indemnify, defend and hold Realty harmless from "any loss, theft or damage to property or injury to or about the leased premises whether or not such are occasioned by the negligence of the Lessee, Lessee's agents or employees."
* * * * * *
The indemnity agreement here contains no provision which could be construed as *919 an agreement to indemnify Realty [lessor] against its own negligence.
Other cases addressing this issue also lend support to Kleinpeter's argument that the trial court erred in holding that it owed Winn Dixie indemnification for its own negligent acts under the agreement they entered.
In Harris v. Agrico Chem. Co., 570 So.2d 474 (La.App. 5th Cir.1990) this court found that the language in that indemnity agreement, which provided indemnification "whether arising out of negligence on the part of Agrico [indemnitee] or otherwise," unambiguously and unequivocally expressed the intent to indemnify for the indemnitee's negligence.
And in Arnold v. Stupp Corporation, 205 So.2d 797 (La.App. 1st Cir.1967), Stupp Corporation (Stupp), a steel pipe manufacturer, entered into an agreement with Charles Carter & Co. (Carter), a building contractor, wherein Carter was to replace some bolts in Stupp's main plant. Plaintiff, a Carter employee brought a tort action against Stupp when he was injured working at the Stupp plant. He alleged that he fell from a ladder belonging to Stupp and that the accident was a result of the sole negligence of Stupp. Stupp filed a third party action against Carter for indemnification under an agreement that they had entered into which provided:
Charles Carter & Company, Inc. agrees to defend, indemnify and save harmless Stupp Corporation and Stupp Bros. Bridge & Iron Company against any and all liability, damage, costs, fees and other losses of whatever nature on account of any injury to person or persons, or any damage to any property arising out of, caused by or resulting from the sale, handling, loading or use of any materials purchased from Stupp Corporation by Charles Carter & Company, Inc., or caused by or resulting from any business transaction with or work done for Stupp Corporation and/or Stupp Bros. Bridge & Iron Company by Charles Carter & Company, Inc.
The trial court sustained Carter's exception of no cause of action, finding that Carter did not owe Stupp indemnification for its own negligence under the indemnification agreement that existed between them. The court of appeal affirmed that decision stating:
The above quoted indemnity agreement and others similar to it have been the subject of much litigation out of which has evolved, as expected, a general rule with exceptions, including majority and minority adherence.
The general rule is stated thus: `a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting to him through his own negligent acts, where such intention is not expressed in unequivocal terms. 27 Am.Jr., Indemnity, § 15, page 464; 42 C.J.S. Indemnity § 12, page 580.' The established principle supporting the rule is that general words alone, i.e., `any and all liability', do not necessarily import an intent to impose an obligation so extraordinary and harsh as to render an indemnitor liable to an indemnitee for damages occasioned by the sole negligence of the latter.
The minority view is bottomed on the premise that the words `any and all liability' are unambiguous and the use thereof means just that and the restrictive interpretation adhered to in the majority view is violative of the rule of law that a contract freely entered into, which is not against public policy or prohibited by law, is the law between the parties and subject to judicial recognition and enforcement. 77 A.L.R.2d 1134.
For reasons hereinafter stated we are of the opinion and so hold that Louisiana is committed to the majority view. Motor Sales & Service v. Grasselli Chemical Company, 15 La.App. 353, 131 So. 623, (Orl.App., 1930); Buford v. Sewerage & Water Board of New Orleans, 175 So. 110 (Orl.La.App., 1937); Dorman v. T. Smith and Son, Inc., 55 So.2d 587 (Orl.La.App., 1951); Moore v. Liberty Mutual Insurance Co., La.App., 149 So.2d 192 (3rd Cir., 1963); Brady v. American Insurance Co., 198 So.2d 907 (4th Cir., 1967).
Winn Dixie contends that the cases following Arnold did not adhere to the majority view as stated therein. However, as can be seen from the cases cited above, the jurisprudence since Arnold has adhered to the majority view as stated therein, requiring explicit, unequivocal language in the indemnity agreement clearly expressing the intent to *920 provide indemnification for the indemnitee's negligence before such intent will be found to exist.
In the instant case, there is no such express, unequivocal language evidencing Kleinpeter's intent to indemnify Winn Dixie for its own negligent acts. The indemnity agreement with the more general language "any and all" cannot be read as including the extraordinary and harsh obligation to indemnify the indemnitee for damages occasioned by the sole negligence of the latter.
Therefore, we find that the trial court erred in granting summary judgment in favor of Winn Dixie, and in denying Kleinpeter's motion for summary judgment, based on the determination that under the indemnification agreement Kleinpeter owed Winn Dixie indemnification for the injuries which Stewart suffered as a result of Winn Dixie's sole negligence. Kleinpeter does not owe Winn Dixie indemnification under the terms of the contract between them for damages resulting from Winn Dixie's sole negligence.
Accordingly, for the reasons set out above, we affirm the trial court judgment as to liability and damages and reverse insofar as it granted Winn Dixie's motion for summary judgment and denied the motion for summary judgment filed by Kleinpeter. Costs of appeal are assessed to Winn Dixie.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
NOTES
[1] Defendant argues for the first time in appellate brief, despite a contrary argument in post trial memoranda, that La. R.S. 9:2800.6 should not be applied in this case because the plaintiff was a delivery man instead of a customer. The general rule is that issues raised for the first time on appeal will not be considered. Segura v. Frank, 93-1271, 93-1401 (La.1/14/94) 630 So.2d 714; Fried v. Bradley, 219 La. 59, 52 So.2d 247 (1950); Sanders v. Ashland Oil, Inc., 94-1469 (La. App. 1st Cir. 5/5/95) 656 So.2d 643, writ denied 95-1797 (La.11/3/95) 661 So.2d 1389. Moreover, La. R.S. 9:2800.6 applies to "persons" without distinction of whether they are customers or delivery men, and is pro defense legislation increasing the burden of proof on the plaintiff which would otherwise be governed by La. C.C. art. 2315. The trial court clearly found that plaintiff could not have seen the broken egg while pushing the dolly full of crates. Thus, we will consider the case under La. R.S. 9:2800.6 as argued in the trial court.
[2] La. R.S. 9:2800.6 was amended by act 8 of the 1996 extraordinary session, but is not applicable to the instant case. The act provides as follows:

A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, in addition to all other elements of his cause of action, all of the following:
(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable.
(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.
(3) The merchant failed to exercise reasonable care. In determining reasonable care, the absence of a written or verbal uniform cleanup or safety procedure is insufficient, alone, to prove failure to exercise reasonable care.
C. Definitions:
(1) "Constructive notice" means the claimant has proven that the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care. The presence of an employee of the merchant in the vicinity in which the condition exists does not, alone, constitute constructive notice, unless it is shown that the employee knew, or in the exercise of reasonable care should have known, of the condition.
(2) "Merchant" means one whose business is to sell goods, foods, wares, or merchandise at a fixed place of business. For purposes of this Section, a merchant includes an innkeeper with respect to those areas or aspects of the premises which are similar to those of a merchant, including but not limited to shops, restaurants, and lobby areas of or within the hotel, motel, or inn.
D. Nothing herein shall affect any liability which a merchant may have under Civil Code Arts. 660, 667, 669, 2317, 2322, or 2695.
Section 2. The provisions of this Act shall apply only to those causes of action arising on or after the effective date of this Act. Section 3. This Act shall become effective upon signature by the governor or, if not signed by the governor, upon expiration of the time for bills to become law without signature by the governor, as provided in Article III, Section 18 of the Constitution of Louisiana. If vetoed by the governor and subsequently approved by the legislature, this Act shall become effective on the day following such approval.
Approved May 1, 1996.
[3] We have not gone into the wrist injury because neither defendant has taken issue with the $30,000 general damage award for that injury. However, the accident did necessitate surgery to the wrist which is now immobile as a result.