625 So.2d 1337 (1993)
Mike THERIOT, Individually and on Behalf of His Minor Son, Chad Theriot
v.
ALLSTATE INSURANCE COMPANY, Timothy Monk, Kim Monk, David Fontenot and State Farm Casualty Company.
No. 93-C-0807.
Supreme Court of Louisiana.
October 28, 1993.
*1339 Michael H. Schwartzberg, Robert M. McHale, McHale, Bufkin & Dees, Lake Charles, for applicant.
Jeanne M. Sievert, James A. Blanco, Stockwell, Sievert, Vicellio, Clements & Shaddock, Lake Charles, for respondent.
ORTIQUE, Justice[1].
This suit was brought by Mike Theriot acting individually and on behalf of his minor child, Chad, to recover damages resulting from a bicycle accident which caused certain injuries to Chad's eye. The defendants are Mr. and Mrs. Timothy Monk, David Fontenot, and their respective homeowners insurers, Allstate Insurance Company and State Farm Casualty Company.

I.
On May 8, 1989, Chad Theriot, then eleven years of age, was lying on his back in Tim and Jessie Monk's yard. Jessie Monk handed Tyler Monk, a baby, to Chad. After Chad had been on the ground playing with the baby for a few minutes, Devin Scott Fontenot (hereinafter referred to as "Scotty"), eleven years of age, rode up on his bicycle. Scotty parked the bicycle by putting down the kick stand, but a few minutes later it fell. The hand brake hit Chad in the eye causing injury. Mike Theriot and Timothy Monk responded to the screams of Chad, providing first aid at the scene of the accident, and then transporting Chad to Lake Charles Memorial Hospital. Once at the hospital, Dr. Kenneth R. Harper diagnosed Chad's injury as "avulsion of the superior oblique, superior rectus and levator muscle; laceration of lid and bulbar conjunctiva." On the same day, Dr. Harper assisted by Dr. Larry Stewart performed surgery on Chad to repair the laceration. The procedure lasted 1½ to 2 hours and was done under general anesthesia. Chad was released from the hospital the following day. He missed one week from school. During that week, Chad's father would bring school work home for him to do. For one week, Chad had a bandage on his eye and was confined to bed. The bandage was eventually removed. Chad wore a patch on his right eye for approximately six weeks. Chad developed complaints of double vision and a condition known as ptosis which is the inability of the muscles to completely raise the eyelid (drooping right eyelid) which his physicians relate to the trauma sustained. The record supports without equivocation or dispute all of the above recited facts.

II.
This matter was tried by jury. Mr. and Mrs. Monk and their homeowners insurer, Allstate Insurance Company were dismissed on directed verdict. The jury returned a verdict for the plaintiff, finding Scotty Fontenot negligent and that his negligence was the cause-in-fact of the accident. The jury awarded damages as follows:

Past medical expenses $8,626.91 in full
 _________________
Future medical expenses $-0-
 _________________
Past, Present and Future
mental and physical pain
and suffering, permanent
disability and disfigurement. $20,000
 _________________
 Total: $28,626.21
 =================

The jury rejected plaintiffs' claims for future medical expenses, including the claim for expenses related to future surgery to correct the ptosis. Plaintiffs appealed the jury's award, contending that jury abused its discretion in the low award for general damages, in failing to reward any damages for Chad's limitation and/or loss of vocational opportunities and in its failure to award anything for future medical expenses. The appellate court affirmed the trial court judgment, concluding that the jury did not abuse its discretion, finding the amount of the damages awarded by the jury was adequate.[2]

III.
We granted writ to determine whether the jury abused its discretion in its award of $20,000.00 in general damages, or in its failure to award any damages for limitation *1340 and/or loss of vocational opportunities, or in its denial of an award for future medical expenses. For the reasons expressed, we find the jury abused its discretion in awarding $20,000.00 for past, present and future mental and physical pain and suffering, permanent disability and disfigurement; in rejecting the claims for limitation and/or loss of vocational opportunities, and future medical expenses. The award of general damages in the amount of $20,000.00 is so low as to constitute a clear abuse of the jury's discretion. We further find that the jury abused its discretion in failing to award any damages for future medical expenses and in failing to make any award whatsoever for limitation and/or loss of vocational opportunities. We affirm the jury's verdict as to the negligence of young Fontenot being the sole cause of the accident and injury to Chad Theriot. We amend that portion of the trial court judgment awarding general damages and special damages for limitation and/or loss of vocational opportunities and future medical expenses, including surgery to correct the ptosis.

IV.
Our jurisprudence has consistently held that in the assessment of damages, much discretion is left to the judge or jury, and upon appellate review such awards will be disturbed only when there has been a clear abuse of that discretion, Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1977). And, "[i]t is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review be considered either excessive or insufficient," Reck v. Stevens, 373 So.2d 498, 501 (La.1979). Appellate courts review the evidence in the light which most favorably supports the judgment to determine whether the trier of fact was clearly wrong in its conclusions. Arceneaux v. Dominque, 365 So.2d 1330 (La.1978). Before an appellate court can disturb the quantum of an award, the record must clearly reveal that the jury abused its discretion. In order to make this determination, the reviewing court looks first to the individual circumstances of the injured plaintiff. Only after analysis of the facts and circumstances peculiar to the particular case and plaintiff may an appellate court conclude that the award is inadequate. See Reck v. Stevens, supra; Cariere v. State Farm Insurance Co., 467 So.2d 867 (La.App.2d Cir. 1985).
Prior awards under similar circumstances serve only as a general guide. If the appellate court determines that an abuse of discretion has been committed, it is then appropriate to resort to a review of prior awards, to determine the appropriate modification of the award. In such review, the test is whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. See Reck v. Stevens, supra; Wactor v. Pickens Lumber Co., 505 So.2d 815 (La.App.2d Cir.1987), writ denied, 508 So.2d 827 (La.1987). In instances where the appellate court is compelled to modify awards, the award will only be disturbed to the extent of lowering or raising an award to the highest or lowest point which is reasonably within the discretion afforded the trial court. American Motorist Insurance Company Inc. v. American Rent-All, Inc., 579 So.2d 429 (La.1991); Scott v. Hospital Service District No. 1 of the Parish of St. Charles, 496 So.2d 270 (La.1986); Carollo v. Wilson, 353 So.2d 249 (La.1977); Coco v. Winston Industries, Inc., supra.
This court recently considered the standard of appellate review of general damages awards in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993); the majority opinion contains the following commentary of the interpretation and application of the controlling legal precepts:
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so *1341 that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.

V.
We have carefully reviewed the medical assessments made in this case, specifically noting the affect of the injury, the age of the victim and the fact that there will always be a residual disability, continuing for the life of this youngster. We find that the award by the jury to be below that which a reasonable trier of fact could assess. Stated succinctly and based upon the jurisprudence, we deem the compensatory damage award of $20,000.00 in this case to be the result of improper considerations on the part of the jury. There is no other reasonable ground to explain the inadequacy of the amount of the award. The conclusion is compelling that the jury abused its discretion in assessing such an unreasonably low quantum of damages for the particular injuries Chad Theriot suffered under the particular circumstances of this case.
The evidence shows that Chad Theriot sustained a serious injury with laceration to his right eye. He underwent surgery to repair the damage. As a result of the injury, Chad has a permanent impairment of vision, a 2 millimeter ptosis and scar around the right eye. In addition to the obvious physical scarring and lid impairment, he suffered a visual disorderdiplopia[3].
All of the physicians who treated Chad, or who were consulted agree that there are abnormalities to the right eye which are the consequence of the injuries to his eye muscles, directly related to and the result of the accident of May 8, 1989. Dr. Kathryn Musgrove, an ophthalmologist specializing in strabismus, diagnosed Chad's condition as hypertropia.[4] In her opinion, the double vision had stabilized at a period of time two years post-accident and will not improve on "up gaze" or "down gaze". Her deposition testimony is unequivocal:
Chad's left eye "is elevated higher than the right eye, precluding the use of the eyes together and producing double vision. So that in up gaze, Chad's left eye elevates higher than his right eye and it produces a double vision in up gaze that is vertically displaced.
In down gaze at near, he has a deviation where the eyes turn in or cross. This produces at near down gaze, a double vision which is secondary to those crossed eyes."
According to Dr. Musgrove's interpretation of diagnostic tests results, the double vision occurs when looking up past 20 degrees straight, past 40 degrees downward, past 30 degrees on the right, past 50 degrees on the left. Dr. Musgrove did not recommend surgery to correct Chad's double vision. Her conclusion was based, not on the indication that the eye condition was not serious or not in need of correction. She was convinced that the surgery was "too risky" to perform. Excerpted below is the relevant portion of her testimony:
Q. Surgery would be a possibility of correcting the problem?
A. In Chad's case I did not recommend surgery for the reason that his double vision is in eccentric fields of gaze. In order to try to correct those, we could produce worse double vision in the primary fields of gaze.

*1342 Q. So in other words, if you went in to try to correct it, it might do more harm than good?
A. I could make him worse instead of better. That is especially true of a vertical deviation such as he has in up gaze. The down gaze deviation again isalthough it produces intractable double vision, is a small enough deviation; and with evulsion of the superior oblique tendon, I did not feel it was amenable to surgery and certainly not worth the risk of producing double vision in his primary fields of gaze.
Even more serious limitations were observed by Dr. Melvin Spira, a plastic surgeon consulted on this case. Dr. Spira testified that Chad had a limitation of motion of the eye globe, resulting in limitation of upward, lateral, and possibly medial gazes. Dr. Spira testified as follows:
Q. Was there any problem with the movement of the orbit of the eye as far as you recall, or did you examine that aspect?
A. There was a limitation of motion of the globe. And I did not go into a detailed examination of it, but I did notice that he had some limitation of upward and lateral gaze, possibly medial gaze. In other words, the eye would not totally rotate in all of its normal positions.
While the testimony of Dr. Musgrove was never "fine tuned" so as to raise questions about the effect this would have on Chad's school work, it is reasonable to conclude that every task where he is called upon to read and/or perform an assignment will be affected by his visual impairment. Even the simplest tasks involving reading will require Chad to adjust his head, so as to avoid the double vision. This serves as a constant reminder of the accident and injuries which he sustained. It will continue uninterruptedly for the remainder of his life. Dr. Musgrove interprets the problem thusly:
Q. The problem that he has with the down gaze is something that he's just going to have to learn to live with and adjust his reading habits and so forth?
A. Most of the time individuals don't read in extreme down gaze. And Chad has already adapted to avoiding extreme down gaze. When he reads, he holds his book no more than about 20 degrees below his visual axis. At that point he can fuse that is, use his vision in each eye simultaneouslywithout double vision. He won't everI don't believebe able to read in extreme down gaze without experiencing double vision.
According to Chad's own testimony (which is corroborated by physician testimony), he has double vision. This causes him problems reading, unless his head is positioned at just the correct angle which has been ascertained by Dr. Musgrove to be 20 degrees below his visual axis. In addition to causing Chad a problem with his reading, the double vision interferes with other normal childhood activities such as his ability to play football, baseball, basketball as well as other sports.
The conclusion is inescapable that Chad is not likely to succeed in those games of skill demanding instantaneous mechanical reflexes, enhanced by visual perception. Further physician testimony indicates that Chad's double vision interferes with his ability to perform "overhead work." Thus one can reasonably conclude that this will adversely affect his ability to participate in the usual childhood activities such as tree climbing, tent pitching and the like. Because of his double vision, Chad will not be able to participate fully in these normal activities of growing adventurous teenagers. Thus Chad's double vision is likely to set him apart from other teenagers in that he will either be precluded from, or limited to some degree whenever he pursues activities which involve "overhead work." Curious pursuits of his teen years are effectively curtailed, solely due to an accident he sustained when he was eleven.
On reviewing the evidence submitted in this case, this court is satisfied that the evidence preponderates in plaintiffs' favor. Chad Theriot will experience mental anguish for the rest of his life for the losses associated with his permanent vision impairment and disability as a result of the May 8, 1989 injury. Accordingly, he is entitled to be compensated for his past, present and future pain and suffering in addition to his permanent disability and disfigurement. We feel *1343 that $35,000.00 is the lowest amount reasonably within the jury's discretion for past, present and future pain and suffering, permanent disability and disfigurement. In determining the appropriate amount of the award, we have reviewed cases involving similar eye injuries. Our review of awards for similar eye injuries reveals that recent awards range from $30,000.00 to $250,000.00.[5]

VI.
Plaintiffs contend that the jury and the appellate court abused its discretion in failing to award anything for limitation and/or loss of vocational opportunities. We agree. The failure of the jury to award any damages for limitation and/or loss of vocational opportunities further impresses this court that the jury hurriedly awarded damages, giving little thought and less attention to these significant claims for damages. We also recognize that the court of appeal failed to acknowledge and rectify this injustice.
A careful review of the record supports plaintiffs' claim for limitation and/or loss of vocational opportunities. Plaintiffs presented evidence relative to limitations on Chad Theriot's future employment opportunities. The most compelling evidence on the record to support plaintiffs' contention is the testimony adduced from the physicians that as a result of the double vision, Chad is precluded from pursuing certain types of vocational fields and occupations. As previously indicated, Dr. Harper testified that Chad would have difficulty performing overhead work. For example, "Chad would not be able to get a license as a commercial pilot." Dr. Musgrove testified that Chad's double vision "would limit him from being a carpenter; electrician; operating overhead equipment; operating microscopes." The occupations enumerated by Dr. Musgrove require extreme downward gaze. It is reasonable to conclude that in an age of sophisticated electron and laser instruments, Chad is likely to find many doors closed to him. Dr. Stewart concurred that Chad would have difficulty doing any overhead work. This court is particularly persuaded by the testimony of defendant's expert, Dr. Richard J. Bourgeois. He opined that there are numerous occupations from which Chad would be precluded as a result of the permanent impairment of his vision. Even a cursory examination of his statement is compelling and prophetic:
Well, I thought about the possible occupations that that [sic] could limit one in and, certainly, this would definitely exclude him from being a pilot or possibly being a navigator if he's inclined to enter, say, the Air Force. I'm not sure of the full military requirements for vision, but I think double vision on extremes of gaze would limit him to any type of visually intensive roles probably and possibly even keep him out of combat and other things like construction work where you're walking on scaffolding and whatnot, even things like automotive repair where you spend prolonged hours looking up or repairing underneath vehicles. So those types of things would certainly cause him problems with double vision if it didn't improve.
Plaintiffs have established and proven a claim for limitation and/or loss of vocational opportunities. The record reflects that plaintiffs enlarged their pleadings and claim for damages, eliciting proof without objection *1344 that Chad's double vision precluded certain employment opportunities. LSA-C.C.P. art. 1154.[6] We recognize the difficulty inherent in fixing damages for limitation and/or loss of vocational opportunity. This responsibility is made no less complex considering the youth and inexperience of this plaintiff. Nonetheless, it is the duty of the jury to endeavor to fix damages to compensate plaintiff for losses occasioned by the fault of another. As the judge instructed the jury on the law applicable to this case: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." LSA-C.C. art. 2315. The principle of simple reparation is so well established in our jurisprudence that no jury can ignore its meaning or implication for a personal injury resulting from the negligence of another. The jury did not award plaintiff any sum for his limitation and/or loss of vocational opportunities. The jury abused its discretion in failing to award damages for this loss. The appellate court likewise abused its discretion in its review when it did not award any damages for limitation and/or loss of vocational opportunities.
On reviewing the evidence submitted on the plaintiffs' claim for limitation and/or loss of vocational opportunities, we are convinced that plaintiffs' uncontroverted evidence establishes a claim for loss of vocational opportunities. Having determined that the jury and the appellate court abused its discretion in this regard, it is the function of this court to raise the amount to the lowest figure within the jury's discretion. Reck v. Stevens, supra. On the facts of this case, we conclude that $50,000.00 is the lowest amount reasonably within the trial court's discretion for limitation and/or loss of vocational opportunities to compensate Chad Theriot for this loss.

VII.
Plaintiffs claim future special damages for medical expenses. The jury did not award any damages for future medical expenses. We find that the jury abused its discretion in its failure to award any damages for future medical expenses necessitated by the accident. The uncontradicted testimony of Dr. Spira supports plaintiffs claim for future medical expenses. He testified that Chad's eye could droop more as he ages. The ptosis could be surgically corrected, if Chad so elects at a future time. At trial, Chad testified that he would probably undergo the surgery in the future. According to Dr. Spira, the costs involved in this surgical procedure are in the amount of 3,700.00. No evidence or testimony challenging either the necessity of future surgery nor the estimated costs thereof was offered by the defense. Plaintiff is entitled to future medical expenses in the amount of $3,700.00. This is the lowest amount that the jury could have awarded within its discretion for future medical expenses.

DECREE
Accordingly, for the foregoing reasons, the judgment of trial court is affirmed in part, reversed in part and amended. The judgment of the court of appeal is vacated. Judgment is entered in favor of plaintiffs, Mike Theriot and his minor child, Chad Theriot and against David Fontenot and State Farm Casualty Company in the total amount of $97,326.91 together with legal interest from date of judicial demand until paid. It is further ordered, adjudged and decreed that defendants, David Fontenot and State Farm Casualty Insurance Co. are cast for the costs of these proceedings.
*1345 AFFIRMED IN PART, REVERSED IN PART, AMENDED AND RENDERED.
LEMMON, J., concurs in part and dissents in part and assigns reasons.
KIMBALL, J., concurs in part and dissents in part for reasons assigned by LEMMON, J.
WATSON, Justice, joins the opinion but adds a concurring statement:
What the majority opinion does, in effect, is to say that the jury does not appear to have considered sufficiently the loss of future employment opportunities in awarding general damages. When properly weighed, that loss calls for an increase of $65,000 in general damages, making the total $85,000. I concur in the total as well as an additional award for future medical.
LEMMON, Justice, concurring in part and dissenting in part.
I concur in the majority's awarding of $50,000 for impairment of earning capacity. This element of damages was clearly proved in the trial court, and the jury greatly abused its discretion in refusing to award any amount for this element of damages.
I dissent, however, from the majority's increasing the award of general damages from $20,000 to $35,000. An award of general damages cannot be calculated with mathematical certainty, and the jury has great, and even vast, discretion in fixing the amount of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). I cannot say from the particular facts and circumstances of this particular case that the award of $20,000 to this particular plaintiff for this particular injury was an abuse of that vast discretion.
NOTES
[1] Pursuant to Rule IV, Part 2, § 3, Hall, J. was not on the panel which heard and decided this case. See footnote in State v. Barras, 615 So.2d 285 (La.1993).
[2] Mike Theriot, et al. v. Allstate Insurance Company, et al., No. 92-782 (La.App.3rd Cir. Mar. 17, 1993).
[3] diplopia, Stedman's Medical Dictionary 399 (4th Unabridged Lawyer's Ed.1976)

Double vision; the condition in which a single object is perceived as two objects.
[4] hypertrophia Hypertrophy, Stedman's Medical Dictionary 675 (4th Unabridged Lawyer's Ed. 1976)

Overgrowth; general increase in bulk of a part or organ, not due to tumor formation. Use of the term may be restricted to denote greater bulk through increase in size, but not in number, of the individual tissue elements.
[5] Our review of awards for similar eye injuries focused on general damages awarded between the years of 1985 and 1991. The pertinent analysis of cases addressing quantum is set forth below:

See: Broussard v. Peltier, 479 So.2d 679 (La. App.3rd Cir.1985) [rupture and hemorrhage of eye, residual decrease in vision-$30,000 general damages]; Foster v. Lafayette Ins. Co., 504 So.2d 82 (La.App.2nd Cir.1987) [eye injury, scarring, residual light sensitivity, impaired vision-$75,000]; Buquoi v. Allstate Insurance Co., 556 So.2d 163 (La.App.5th Cir.1990) [noncorrectible impairment to vision such that upward/downward eye movements would result in double vision-$45,000]; Daigle v. Melancon, 558 So.2d 267 (La.App.3rd Cir.1990) [Plaintiff underwent surgical operations; eye will never be normal, but with a contact lens and treatment visual acuity will improve. Plaintiff could read, drive a car, do usual tasks and likely hold down a job in the future. The award includes special damages and a loss of earning capacity-$250,000]; Hurst v. Eaton, 588 So.2d 1130 (La.App.1st Cir.1991) [horizontal diplopia with a 25% whole body disability rating-$45,000]; Hood v. State through the Department of Transportation and Development, et al., 587 So.2d 755 (La.App.2nd Cir.1991) [lost permanent vision in one eye-$100,00].
[6] LSA-C.C.P. art. 1154 provides:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading. Such amendment of the pleadings as may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is objected to at trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby, and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense on the merits. The court may grant a continuance to enable the objecting party to meet such evidence.