40 So.3d 989 (2010)
Phouthone THONGSAVANH and Southone Thongsavanh
v.
Martha W. SCHEXNAYDER, Louisiana Farm Bureau Casualty Insurance Company, Robert Groome and State Farm Fire and Casualty Company.
No. 2009 CA 1462.
Court of Appeal of Louisiana, First Circuit.
May 7, 2010.
*992 William C. Rowe, Jr., David C. Bolton, Baton Rouge, Louisiana, for Defendant/Appellant, Martha W. Schexnayder.
Harley M. Brown, Baton Rouge, Louisiana, for Plaintiff/Appellee, Phouthone Thongsavanh.
Before DOWNING, GAIDRY, and McCLENDON, JJ.
GAIDRY, J.
A driver involved in a motor vehicle accident appeals a judgment against her for personal injury damages awarded to a passenger in another vehicle, and the passenger answers the appeal, seeking modification of the allocation of fault and an increase in the damages awarded. For the following reasons, we affirm the trial court's judgment and deny the answer to the appeal.

FACTUAL AND PROCEDURAL BACKGROUND
The plaintiff, Phouthone Thongsavanh, and her husband, Southone Thongsavanh, are natives of Laos and residents of Ascension Parish. Plaintiff, who is presently 58 years old, has unfortunately been quadriplegic and totally disabled since 1998.
This action arose from a motor vehicle accident that occurred shortly after 5:00 p.m. on December 5, 2005 in Ascension Parish, near the City of Gonzales. The *993 accident occurred at the intersection of U.S. Highway 61 (Airline Highway) and Louisiana Highway 431 (which becomes Louisiana Highway 30 on the western side of Airline Highway). Airline Highway is a four-lane highway with two northbound lanes and two southbound lanes, with additional right and left turning lanes in both directions at the intersection at issue. Louisiana Highway 431 is a two-lane highway, with a right turning lane for entry into the right or outer northbound lane of Airline Highway. The intersection is controlled by traffic lights.
Immediately prior to the accident, Robert Groome was operating his pickup truck in the right northbound lane of Airline Highway, approaching the intersection. At the same time, Martha W. Schexnayder was operating her automobile in the opposite, southbound direction, in the left turn lane. Plaintiffs husband was operating their Volkswagen Beetle automobile in the right turning or outer lane of Louisiana Highway 431, preparing to turn right onto Airline Highway northbound. Mr. Groome proceeded through the intersection pursuant to a green traffic signal. The traffic signal facing Ms. Schexnayder was also green, but there was no green turn arrow granting turning traffic the right of way. After Ms. Schexnayder initiated a left turn, her automobile struck Mr. Groome's pickup truck on the driver's side, causing it to rotate clockwise. The pickup truck then struck the driver's side of the Volkswagen occupied by plaintiff and her husband. As the result of the impact between Mr. Groome's pickup truck and the Volkswagen, plaintiff sustained significant injuries.
Plaintiff and her husband filed suit on December 5, 2006, naming as defendants Ms. Schexnayder and her liability insurer, Louisiana Farm Bureau Casualty Insurance Company (Farm Bureau), and Mr. Groome and his liability insurer, State Farm Mutual Automobile Insurance Company (State Farm).[1] The defendants filed answers, denying liability and affirmatively alleging the comparative fault of each other and plaintiffs husband.
The case was tried before a jury on May 13 and 14, 2008. Following the trial, the jury returned a verdict in favor of plaintiff and against Ms. Schexnayder (defendant) and her insurer, finding defendant 90% at fault, Mr. Thongsavanh 10% at fault, and Mr. Groome free from fault. The jury awarded plaintiff $150,000.00 in total damages, itemized as follows:

 Physical pain and suffering (past and
 future): $50,000.00;
 Mental pain and suffering (past and
 future): $19,328.17;
 Past medical expenses: $61,342.66;
 Permanent disability: $19,329.17.

The trial court signed a judgment in accordance with the jury's verdict on October 15, 2008, adjudging defendant and Farm Bureau in judgment in solido for $13,674.71 and defendant solely liable for the balance of $121,325.29.[2] All court costs were assessed to Farm Bureau, and legal interest on the judgment was apportioned to defendant and Farm Bureau according to the terms of Farm Bureau's policy.
On October 29, 2008, defendant and Farm Bureau filed a motion for judgment notwithstanding the verdict (JNOV) and an alternate motion for new trial. Those post-trial motions were heard on January 30, 2009, and denied by the trial court by judgment signed on March 2, 2009.
*994 Defendant now appeals, and plaintiff has answered the appeal.

ASSIGNMENTS OF ERROR
We summarize defendant's assignments of error as follows:
1. The trial court committed legal error by excluding from evidence a recorded statement of one of the defendant drivers.
2. The trial court committed legal error by excluding from evidence diagrams of the accident scene prepared by an accident reconstruction expert.
3. The trial court committed legal error in its qualification of the interpreter used to translate testimony at trial, as the interpreter was not certified and was acquainted socially with plaintiff and her husband.
4. The jury was clearly wrong or manifestly erroneous in its apportionment of only 10% fault for the accident to plaintiffs husband.
5. The jury abused its discretion by awarding excessive amounts for elements of general damages.
In her answer to the appeal, plaintiff contends that the jury was clearly wrong in finding and apportioning 10% of the fault for the accident to her husband and that the jury abused its discretion in awarding her inadequate damages.

DISCUSSION

Written Statement of Defendant Driver
Following the accident at issue, Mr. Groome, the driver of the pickup truck, prepared a brief written statement describing what he observed, and his statement was made part of the investigating state police trooper's accident report. In that written statement, Mr. Groome explained that "[there] was no place to swerve because there was a car pulling onto Hwy 61 [Airline Highway] North bound [sic]," and that he "tried to miss the white car but hit it and slammed into the black car." Defendant's automobile was white; the Volkswagen occupied by plaintiff and her husband was black. The basis of defendant's contention that plaintiffs husband, Mr. Thongsavanh, was negligent was his alleged intrusion into or toward Mr. Groome's lane of travel.
Defendant contends that the written statement was properly admissible in evidence as a "present sense impression" under La. C.E. art. 803(1), which provides:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
(1) Present sense impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.
We disagree. Although Mr. Groome acknowledged preparing and signing his written statement on the day of the accident, there was no evidentiary foundation laid to satisfy the critical requirement of immediacy following the perceived event. The supreme court has explained the phrase "immediately thereafter" as "allowing only for `the time needed for translating observation into speech.'" Buckbee v. United Gas Pipe Line Co., Inc., 561 So.2d 76, 84 (La.1990).
We likewise reject defendant's argument that the statement was properly admissible as a prior inconsistent statement to impeach Mr. Groome. Our review of Mr. Groome's trial testimony does not reveal that Mr. Groome actually testified inconsistently with the content of his statement; he simply did not mention the presence or location of the Volkswagen prior to the occurrence of the accident because the questions posed to him did not elicit such *995 information. More importantly, the contents of Mr. Groome's written statement were provided to the jury through his trial testimony. At the request of defendant's counsel, he read his written statement verbatim, acknowledged preparing it on the day of the accident, and conceded that his memory of the described events at that time was more precise than at trial. Under these circumstances, the trial court did not abuse its discretion in excluding the written statement's introduction into evidence. See La. C.E. art. 613 and Boutte v. Kelly, 02-2451, p. 24 (La.App. 4th Cir.9/17/03), 863 So.2d 530, 548, writ denied, 04-0071 (La.5/21/04), 874 So.2d 172. This assignment of error has no merit.

Diagrams of Accident Reconstruction Expert
Andrew J. McPhate was accepted by the trial court as an expert witness in mechanical engineering, vehicle dynamics, and accident reconstruction. He was called to testify on behalf of defendant and Farm Bureau. In addition to reviewing the police accident report, photographs of the involved vehicles, recorded statements of the defendant drivers, and other evidence, he personally inspected and measured the intersection and prepared scale engineering diagrams of it.
As previously noted, a major point of dispute between the parties is the issue of whether Mr. Thongsavanh had begun to move the Volkswagen for a right turn onto Airline Highway immediately before the accident. Based upon the drivers' accounts, the locations of damage on the vehicles, and the final stopped positions of the vehicles, it was Mr. McPhate's opinion that the Volkswagen was in motion and past the "stop bar" or line designating the proper stopping position for a vehicle in the turn lane. Mr. McPhate testified in detail regarding his opinions as to the relative movements and locations of the three vehicles, and his scale diagrams were exhibited to the jury during the course of his testimony to illustrate and elucidate those opinions. We have reviewed the diagrams at issue in light of his trial testimony, and conclude that the trial court did not abuse its discretion in refusing to allow their introduction into evidence. And even if the trial court could be said to have committed any error in refusing to admit the diagrams into evidence, such error was harmless error. See Stewart v. Ice, 07-0871, pp. 7-8 (La.App. 4th Cir.4/9/08), 982 So.2d 928, 933, writ denied, 08-1000 (La.8/29/08), 989 So.2d 101.

Qualification of Interpreter
Defendant contends that the trial court erred in allowing Keokong Sourkidhdy, another Laotian native and social acquaintance of plaintiff, to serve as interpreter. Ms. Sourkidhdy was initially examined by the trial court. She confirmed her understanding that she had the responsibility to accurately interpret the testimony of plaintiff and her husband, and denied any financial relationship or arrangement with them. Under cross-examination by defendant's counsel, she testified that she worked as a special education teacher for the East Baton Rouge Parish School Board for 35 years before retiring. Prior to that time, she had attended law school in Laos and practiced law in that country for two years. She admitted to socializing with plaintiff and her husband about twice a year before the accident, and confirmed that she visited plaintiff once while she was hospitalized following the accident. She initially stated that she had not met with plaintiffs counsel prior to trial, but on further questioning readily corrected herself to confirm that she met with plaintiff and her counsel the day before trial, after being asked by plaintiff to serve as interpreter.
*996 Defendant challenges the trial court's decision on the grounds that Ms. Sourkidhdy was "an acknowledged friend of the family" and "practiced law in Laos for two years." Defendant points to no specific, concrete instance where the accuracy of Ms. Sourkidhdy's interpretation is suspect, but instead presents what amounts to a blanket challenge of presumptive bias.[3]
Louisiana Code of Evidence article 604 provides that "[a]n interpreter is subject to the provisions of this Code relating to qualification as an expert and the administration of an oath or affirmation that he will make a true translation." Louisiana Code of Evidence article 702 in turn provides that a witness may be "qualified as an expert by knowledge, skill, experience, training, or education[.]" At the time this matter was tried, Louisiana had no other procedural articles addressing the qualifications and use of a foreign-language interpreter in civil proceedings.[4]
There is only scant jurisprudence providing any guidance regarding the qualifications of an interpreter. See William J. Burris, The Impact of Language Barriers to Access to Justice, 56 La. B.J. 416, 417 (2009). One older case, State v. Lazarone, 130 La. 1, 7, 57 So. 532, 534 (La.1912), held that "[t]he person chosen to interpret into English testimony given in a tongue not understood by jury, court, or counsel must be absolutely disinterested, unprejudiced, and unbiased[.]" There, the supreme court held that the trial court erred in choosing as interpreter a prosecution witness who had contributed to a fund for the prosecution of the defendant, and that the error was of itself sufficient to vitiate the verdict rendered against the defendant.
The court in Segui v. Anthony, 487 So.2d 616, 618 (La.App. 4th Cir.), writ denied, 489 So.2d 252 (La.1986), rejected a challenge by a Spanish-speaking plaintiff to the trial court's use of its own interpreter, rather than one hired by the plaintiff. The plaintiff contended that the translation was inaccurate or incomplete, but pointed out very few alleged errors, none of which were serious. The court recognized that there were then no statutory prerequisites for an interpreter of a foreign language in court, and held that, absent any showing of "prejudicial error," the issue was properly for the legislature to address.
In State v. Tamez, 506 So.2d 531, 533 (La.App. 1st Cir.1987), a criminal case, we observed:
Our Legislature has not as yet determined the necessary qualifications for interpreters who serve the court by translating proceedings into or from a foreign language. [Footnote omitted.] Nevertheless, it is axiomatic that an interpreter should be a neutral and detached individual whose abilities are first screened by the court and who is sworn to make a true, literal and complete *997 bilateral translation. The use of an unqualified, unsworn interpreter who was the co-defendant with the accused and also has a substantial interest in the proceedings, renders the plea itself questionable.
Defendant raises legitimate questions regarding the issue presented. One commentator has also recently discussed the issue in detail, reviewing the jurisprudence and proposing procedural and conceptual changes. Luz M. Molina, Language Access to Louisiana Courts: A Failure to Provide Fundamental Access to Justice, 10 Loy. J. Pub. Int. L. 1 (2008). That commentator has noted that "[t]he fact of being bilingual does not qualify an individual for court interpreting, even if the person is fluent." Id. at 11. The same commentator has also observed that under the present system, litigants, particularly those without substantial financial means, "must rely on friends and relatives for interpretation services," and suggests that such friends and relatives "most likely will not be qualified to interpret in court." Id. at 25. Finally, it is emphasized that even "[t]he appearance of bias" on the part of an interpreter "should be of concern to the courts and the administration of justice[.]" Id. at 21.
By reason of her acquaintance with plaintiff and her husband, Ms. Sourkidhdy might not have been "absolutely disinterested" according to the strict standard of the Lazarone case. But there was no showing of clear bias or prejudice, and defendant's counsel had a full opportunity to conduct an extensive voir dire examination of Ms. Sourkidhdy on the issue of potential bias. On this point, we note that a witness is not disqualified from qualification as an expert witness simply because he is a party or the employee of a party to a lawsuit. Harrington v. Velinsky, 567 So.2d 148, 153 (La.App. 2nd Cir.1990). In such a case, the party opposing qualification may cross-examine the expert regarding potential bias and argue that point to the trier of fact. Id. Because La. C.E. art. 604 equates the qualification of an interpreter with the qualification of an expert, the same general rule should apply by analogy.
Neither the legislature nor the judiciary has yet adopted objective standards for certification and qualification of foreign language interpreters for legal proceedings. Based upon our review of the current state of our law, the following general standards may be distilled: An interpreter of foreign-language testimony must be competent and qualified by virtue of knowledge, skill, experience, training, or education, have no substantial interest in the proceedings, and be sworn to give a true bilateral translation of the questions and answers given during testimony. A trial court has great discretion in determining whether to qualify a witness as an expert, and such discretion will not be disturbed on appeal in the absence of manifest error. Burdette v. Drushell, 01-2494, p. 13 (La.App. 1st Cir.12/20/02), 837 So.2d 54, 65, writ denied, 03-0682 (La.5/16/03), 843 So.2d 1132. Given the controlling jurisprudence and the trial record, we find no abuse of discretion in the trial court's acceptance of Ms. Sourkidhdy's qualifications for purposes of trial, and no manifest error in its relevant factual findings in that regard. We must conclude that this assignment of error also lacks merit.

Apportionment of Fault
Neither defendant nor plaintiff challenges the jury's finding exculpating Mr. Groome from any fault. Each, however, contends that the other vehicle driver was either entirely or primarily at fault for plaintiffs injuries, and that the jury erred in its apportionment of fault.
*998 Mr. Thongsavanh testified that he was driving his automobile at the time of the accident, with his wife sitting next to him in the front passenger's seat and a friend in the rear seat. Prior to the accident, he was in the right turn lane of Louisiana Highway 431 at its intersection with Airline Highway, stopped in preparation for a turn. He testified that the traffic light facing him was red, and that he could not immediately turn after stopping because of traffic. However, Mr. Thongsavanh admitted that he did not observe either defendant's automobile or Mr. Groome's pickup truck before the occurrence of the accident. Mr. Thongsavanh explained that he heard the sound of the impact between those vehicles, looked to his left, and saw the pickup truck approaching his automobile. The pickup truck struck his automobile and he was rendered unconscious, and he did not regain consciousness until he was in the ambulance with his wife. Finally, Mr. Thongsavanh stated that his automobile had a standard transmission and was in fourth gear at the time of impact, although he denied that his automobile was moving at that time.
Plaintiff recalled that her husband had stopped their automobile in obedience to the red light facing them. She recalled seeing the movement of a vehicle coming toward them immediately before the accident, and that their automobile was not moving at that time, but had no recollection of any other events related to the accident.
Defendant testified that there was a fourth vehicle, coming from the opposite direction in the northbound left turn lane of Airline Highway, that obstructed her view of Mr. Groome's oncoming truck as she initiated her left turn from the southbound left turn lane. She admitted that she did not see Mr. Groome's truck until her automobile struck it, and did not observe Mr. Thongsavanh's Volkswagen prior to or during the course of the accident.
In addition to the testimony previously described relating to his written statement, Mr. Groome testified that he and a passenger, Lonnie Gonzales, were traveling home from work in the right northbound lane of Airline Highway immediately prior to the accident. As he approached the intersection at issue, the traffic light facing him was green. He recalled that there was another vehicle in the northbound left turn lane as he entered the intersection. Upon entering the intersection, he observed defendant's automobile in the opposite southbound left turn lane, and as he proceeded, defendant's automobile turned and struck his pickup truck. Mr. Groome estimated that he was traveling at about 55 miles per hour as he entered the intersection, and testified that the posted speed limit for Airline Highway at that location was 55 or 60 miles per hour. Although he applied his brakes and tried to steer to the right immediately upon seeing defendant's automobile turn, his truck was struck "almost immediately" in the area of the driver's door. He did not recall the nature of his truck's movement until it came to rest, and did not specifically recall his truck's impact with the Volkswagen. The testimony of Mr. Groome's passenger, Lonnie Gonzales, was presented by deposition, and essentially corroborated that of Mr. Groome, except that he recalled the impact with the Volkswagen.
In addition to the testimony previously summarized, the accident reconstruction expert, Mr. McPhate, explained that the fourth vehicle at the intersection, in the northbound left turn lane of Airline Highway, probably obstructed defendant's view of Mr. Groome's oncoming pickup truck when defendant made the decision to initiate her left turn. He estimated defendant's *999 speed during her left turn at less than 20 miles per hour. He explained that Mr. Groome's pickup truck, travelling at 55 miles per hour, would normally have traversed the approximately 100-foot intersection in slightly over a second. Finally, he also expressed the opinion, based upon the projected vehicle dynamics, that the pickup truck would not have struck the Volkswagen, even after being struck by defendant's automobile, if the Volkswagen had in fact been stopped behind the stop bar for its right turn lane.
A determination of negligence or fault is a factual determination. In order to reverse a factual determination by the trier of fact, the appellate court must apply a two-part test: (1) the appellate court must find that a reasonable factual basis does not exist in the record for the finding; and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Stobart v. State through Dep't of Transp. & Dev., 617 So.2d 880, 882 (La. 1993). Further, when factual findings are based upon determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact's findings. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
The allocation of comparative fault between joint tortfeasors is also a factual determination, and the trier of fact's allocation is therefore owed deference. Snearl v. Mercer, 99-1738, p. 27 (La.App. 1st Cir.2/16/01), 780 So.2d 563, 584, writs denied, 01-1319 (La.6/22/01), 794 So.2d 800 and 01-1320 (La.6/22/01), 794 So.2d 801. The supreme court articulated the factors appropriate for consideration in allocating fault between two or more parties in Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985):
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
A reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882 (La.1993).
It is well settled in Louisiana that the trier of fact is not bound by the testimony of an expert, but such testimony is to be weighed the same as any other evidence. Williams v. Rubicon, Inc., 01-0074, p. 5 (La.App. 1st Cir.2/15/02), 808 So.2d 852, 858, writ granted, 02-0802 (La.6/7/02), 818 So.2d 766, writ denied as improvidently granted, 02-0802 (La.12/4/02), 833 So.2d 942, cert. denied, 540 U.S. 812, 124 S.Ct. 54, 157 L.Ed.2d 25 (2003). The trier of fact may accept or reject in whole or in part the opinion expressed by an expert. Wade v. Teachers' Ret. Sys. of La., 05-1590, p. 8 (La.App. 1st Cir.6/9/06), 938 *1000 So.2d 103, 108, writ denied, 06-2024 (La.11/3/06), 940 So.2d 673.
The duties of motorists confronted with traffic signal lights are defined in La. R.S. 32:232, which provides, in pertinent part:
(1) GREEN indication:
(a) Vehicular traffic facing a circular green signal may proceed straight through or turn right or left unless a sign at such place prohibits either such turn. But vehicular traffic, including vehicles turning right or left, shall yield the right-of-way to other vehicles ... at the time such signal is exhibited.
(b) Vehicular traffic facing a green arrow signal, shown alone or in combination with another indication, may cautiously enter the intersection only to make the movement indicated by such arrow, or such other movement as is permitted by other indications shown at the same time. Such vehicular traffic shall yield the right-of-way ... to other traffic lawfully using the intersection.
...
(3) Steady RED indication:
(a) Vehicular traffic facing a steady circular red signal alone shall stop at a clearly marked stop line, or if none, then before entering the crosswalk on the near side of the intersection, or if none, then before entering the intersection, and shall remain standing until an indication to proceed is shown except as provided in Subparagraph (c) of this Paragraph.
...
(c) Except when a sign prohibits a turn, vehicular traffic facing any steady red signal may cautiously enter the intersection to turn right ... after stopping as required by Subparagraph (a)... of this Paragraph. Such vehicular traffic shall yield the right-of-way ... to other traffic lawfully using the intersection.
Paragraph (1) of La. R.S. 32:232 would set forth defendant's duties, as a left-turning motorist governed by a steady green traffic signal without a green turn arrow. Paragraph (3), in turn, would apply to Mr. Thongsavanh's operation of the Volkswagen while governed by a red traffic signal. Additionally, defendant had the following statutory duty under La. R.S. 32:122:
The driver of a vehicle within an intersection intending to turn to the left shall yield the right of way to all vehicles approaching from the opposite direction which are within the intersection or so close thereto as to constitute an immediate hazard.
Our jurisprudence has long held that a left turn is one of the most dangerous maneuvers a motorist may execute and requires the exercise of great caution. Theriot v. Lasseigne, 93-2661, p. 8 (La.7/5/94), 640 So.2d 1305, 1312.
Based upon the evidence and witness testimony, the jury could reasonably have concluded that Mr. Thongsavanh may have entered the intersection and the path of travel of Mr. Groome's approaching truck when it posed a potential hazard (even before the truck was initially struck), thereby placing his vehicle in danger, and that minor inattentiveness on his part contributed to the collision between the truck and his vehicle. The jury obviously accepted, at least in part, the accident reconstruction expert's testimony and Mr. Groome's account of the Volkswagen's movement in his written statement. But the jury nevertheless placed the overwhelming majority of the fault upon defendant as the left-turning motorist whose actions precipitated the sequence of collisions between the three involved vehicles. We cannot conclude that the jury's apportionment *1001 of fault was manifestly erroneous, given the circumstances of the accident and the totality of the evidence in the record. See, e.g., Weber v. Phoenix Assurance Co. of New York, 273 So.2d 30 (La. 1973), and Daniels v. Allstate Ins. Co., 469 So.2d 352, 354-55 (La.App. 2nd Cir.1985). We therefore affirm the trial court's judgment on this issue.

General Damages
Plaintiff was awarded general damages for the elements of physical and mental pain and suffering and permanent disability in the total amount of $88,657.34, Defendant contends that the amount is excessive. Plaintiff contends that it is inadequate, based upon comparison with representative awards in the jurisprudence itemized by bodily areas of injury and general nature of injury.
"General damages" involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money. Boudreaux v. Farmer, 604 So.2d 641, 654 (La.App. 1st Cir.), writs denied, 605 So.2d 1373, 1374 (La.1992). Conceptually, it is difficult as a practical matter to distinguish between "physical" pain and suffering and "mental" pain and suffering resulting from physical injury, although both are frequently referred to as elements or components of general damages. See Oden v. Gales, 06-0946, pp. 13-14 (La.App. 1st Cir.3/23/07), 960 So.2d 114, 122. The primary objective of general damages is to restore the party in as near a fashion as possible to the state he was in at the time immediately preceding injury. Daigle v. U.S. Fidelity and Guar. Ins. Co., 94-0304, p. 7 (La.App. 1st Cir.5/5/95), 655 So.2d 431, 437.
A defendant takes the plaintiff as he finds him and is responsible for all natural and probable consequences of his tortious conduct. When the defendant's negligent action aggravates a preexisting injury or condition, he must compensate the victim for the full extent of that aggravation. Perniciaro v. Brinch, 384 So.2d 392, 395-96 (La.1980). Whether the accident caused the plaintiffs injuries is a factual question that should not be reversed on appeal absent manifest error. Housley v. Cerise, 579 So.2d 973, 979 (La. 1991).
The nature, relative severity, and bodily extent of injuries are qualitative factors that must first be considered by the trier of fact in awarding general damages. The duration of a plaintiffs injury symptoms and the duration of treatment are relevant quantitative factors that must also be taken into account. See Gillmer v. Stuckey, 09-0901, p. 5 (La.App. 1st Cir.12/23/09), 30 So.3d 782, 788, and Thibodeaux v. USAA Cas. Ins. Co., 93-2238, p. 8 (La.App. 1st Cir.11/10/94), 647 So.2d 351, 357.
The trier of fact is accorded much discretion in fixing general damage awards. La. C.C. art. 2324.1; Cheramie v. Horst, 93-1168, p. 6 (La.App. 1st Cir.5/20/94), 637 So.2d 720, 723. The discretion vested in the trier of fact is "great," even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Wainwright v. Fontenot, 00-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74. Before an appellate court can disturb the quantum of an award, the record must clearly reveal *1002 that the jury abused its discretion. In order to make this determination, the reviewing court looks first to the individual circumstances of the injured plaintiff. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). Reasonable persons frequently disagree about the measure of general damages in a particular case. Youn, 623 So.2d at 1261. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award. Id. Only after analysis of the facts and circumstances peculiar to the particular case and plaintiff may an appellate court conclude that the award is inadequate or excessive. See Theriot, 625 So.2d at 1340. And it is only after such a threshold determination of an abuse of discretion that the appellate court should examine prior awards for similar injuries to modify the award within the range of reasonable discretion. See Reck v. Stevens, 373 So.2d 498, 500-01 (La.1979), and Coco v. Winston Indus., Inc., 341 So.2d 332, 335-36 (La.1977). We therefore must first review the particular circumstances of Mrs. Thongsavanh's injuries.
As the result of a spinal cord tumor with cervical neuropathy in 1998, plaintiff was a quadriplegic, although she retained some use of her right arm. The medical evidence showed that plaintiff had a flexion contracture or malformation of her left wrist and hand, with her left arm drawn toward her chest, rendering that arm essentially useless. She was a "total care" patient, requiring 24-hour assistance with all activities of daily living. At the time she first received treatment following the accident at issue, she had severe decubitis ulcers or pressure "bedsores" due to her disabled condition.
Following the accident at issue, plaintiff was taken by ambulance to the emergency room of Our Lady of the Lake Regional Medical Center in Baton Rouge and was admitted for treatment. Her injuries were diagnosed as a closed head injury, including a subarachnoid hemorrhage of the brain and a small subdural hematoma or hemorrhage; a left third cranial nerve injury causing dilation of the pupil of her left eye; and a displaced fracture of the left humerus or upper arm bone. Plaintiff required surgical reduction and internal fixation of the arm fracture while hospitalized. No surgery was required for the head and brain injuries, which were monitored and treated conservatively. She was discharged from the hospital on December 13, 2005. During the eight days of her hospitalization, plaintiff spent five days in the intensive care unit.
Plaintiffs husband testified that when he was first able to see his wife at the hospital following the accident, at 3:00 a.m., she was unconscious. When he visited her again later that morning, plaintiff was briefly conscious, but was disoriented and in a lot of pain. After plaintiff was eventually transferred from the intensive care unit to a regular room, she was able to speak but was not coherent, and she was still in a great deal of pain.
According to her husband, after plaintiff was discharged from the hospital she continued to experience pain, and also suffered from memory loss for about a year. After a year, plaintiffs memory returned to near normal. Plaintiffs husband testified that although plaintiffs left arm was paralyzed prior to the accident, she was able to move it up and down, but after the accident she could move it only with her right hand. Mr. Thongsavanh also claimed that his wife was able to move her toes prior to the accident, but was not able to do so following the accident. As of the *1003 time of trial, plaintiff still had some blurred vision in her left eye.
Plaintiff testified that she was paralyzed prior to the accident as the result of a "stroke," but had some movement of her toes and both arms. She admitted that she had to rely upon assistance from her husband and children to dress and engage in other activities. Her first memory after the accident was about a week after she had returned home after discharge from the hospital. She did not recall at that time having been in the accident, and was confused about why she was in such pain. Following the accident, she lost her residual movement of her toes and left arm. She initially lost vision in her left eye, but some vision began to return about four to five months after the accident, and she had only "foggy" or "blurry" vision in that eye at the time of trial. She also suffered from severe headaches for about six months following the accident, with the pain sometimes causing her to cry. Her upper and lower back also hurt for about five to six months after the accident, especially when she would have to be turned in her bed.
The testimony of Tomas H. Jacome, M.D., plaintiffs treating general surgeon during her hospitalization, was presented by deposition. In addition to detailing the course of her hospitalization, he confirmed her pain from the injuries and the confusion attributable to her closed head injury. However, he conceded that, in terms of overall physical functional disability, her discharge condition was essentially the same as that documented in her pre-accident medical records. Gerald L. Murtagh, M.D., the orthopedic surgeon who managed plaintiffs left arm fracture, also testified by deposition. He explained that even with her quadriplegia or paralysis, plaintiff did suffer "deep pain sensation" due to the fracture, and that because of its oblique nature, the humerus fracture required surgical fixation with plates and screws. He also conceded that because of her pre-existing condition, plaintiff had no actual functional impairment related to the fracture, which eventually healed.
The record clearly supports the conclusion that there were two permissible views of the evidence relating to the nature and extent of plaintiffs injuries and their effect upon her unique individual situation, and that the jury was ultimately required to base its decision upon witness credibility and the underlying medical history and findings of the expert medical witnesses. Such being the case, the jury's implicit findings regarding the character of plaintiffs injuries attributable to the accident cannot be manifestly erroneous. See Stobart, 617 So.2d at 883, and Oden, 06-0946 at p. 11, 960 So.2d at 121.
It is, of course, only human to sympathize with another human being's misfortune and suffering. Based upon our thorough review of the record on appeal, particularly the medical records and testimony, we cannot discern either undue sympathy or callous indifference to justice in the damages awarded by the jury. Accordingly, we find no abuse of the jury's great discretion in the total award of general damages. Thus, it is inappropriate and unnecessary for us to undertake a comparison of the award in this case with past awards for genetically similar injuries. See Youn, 623 So.2d at 1260.

DECREE
Based on the foregoing, we affirm the judgment of the trial court and deny plaintiffs answer to the appeal. All costs of this appeal are assessed to the defendant, Martha W. Schexnayder.
AFFIRMED.
McCLENDON, J., dissents and assigns reasons.
*1004 McCLENDON, J., dissents and assigns reasons.
I must respectfully dissent from my colleagues in this matter. The Louisiana Supreme Court in State v. Lazarone, 130 La. 1, 7, 57 So.2d 532, 534 (1912), set forth a requirement that an interpreter for the court shall "be absolutely disinterested, unprejudiced, and unbiased."[1] However, the majority erroneously rejects this test and substitutes "substantially disinterested" for "absolutely disinterested."
The majority further errs in requiring the challenger of the interpreter to prove "clear bias or prejudice." In adopting this requirement, the majority apparently relies upon Segui v. Anthony, 487 So.2d 616, 618 (La.App. 4 Cir.), writ denied, 489 So.2d 252 (La.1986), wherein a party challenged the use of an interpreter selected by the trial court, but there was no allegation that a prior relationship existed between the interpreter and any of the parties. Rather, the interpreter used therein was "absolutely disinterested" as required by the Louisiana Supreme Court.
In this case the interpreter not only attended the same church as the victim and the victim's husband, but more importantly she visited the victim in the hospital where the victim was receiving treatment as a result of the injuries suffered in this accident. Clearly, this is not the sort of neutral, disinterested or detached individual required for the fair administration of justice expected by our citizens.
The majority analogizes the requirement for a translator to that of an expert. However, there is no requirement that an expert be disinterested. Expert testimony is also subject to being tested by "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Breitenbach v. Stroud, 06-0918, p. 14 (La.App. 1 Cir. 2/9/07), 959 So.2d 926, 936. Further, after weighing and evaluating all of the evidence, a jury is free to accept or reject the opinions expressed by experts. Breitenbach, 06-0918 at p. 14, 959 So.2d at 936. In this context, an interpreter seems more akin to the role of a juror as opposed to that of an expert.
Additionally, in most cases involving an interpreter, a faulty or incomplete translation is an insidious danger, hidden from sight, unless a separate independent translator is available. Contrast Segui, 487 So.2d at 618, wherein the trial attorney representing the party challenging the use of the Spanish/English interpreter was fluent in both languages.
Because Ms. Sourkidhdy was not "disinterested" in this matter, the trial court abused its discretion in allowing her to serve as an interpreter. Accordingly, I would vacate the trial court's judgment and remand this matter for a new trial. Therefore, I respectfully dissent.
NOTES
[1] State Farm was originally named as "State Farm Fire and Casualty Company" in the petition.
[2] Farm Bureau's liability was limited to the remaining amount of its bodily injury liability coverage limits, after previous payment of other injury claims arising from the accident.
[3] Defendant offers no explanation for the supposed relevance of Ms. Sourkidhdy's legal training and practice in Laos to the charge of bias. If anything, such training would seem to militate in favor of a finding of Ms. Sourkidhhdy's understanding of the importance of impartial translation on her part in legal proceedings, rather than a contrary finding.
[4] By Acts 2008, No. 882, § 1, effective August 15, 2008, La. C.C.P. art. 192.2 was enacted, providing as follows:

A. If a non-English-speaking person who is a principal party in interest or a witness in a proceeding before the court has requested an interpreter, a judge shall appoint, after consultation with the non-English-speaking person or his attorney, a competent interpreter to interpret or to translate the proceedings to him and to interpret or translate his testimony.
B. The court shall order reimbursement to the interpreter for his services at a fixed reasonable amount, and that amount shall be taxed by the court as costs of court.
[1] Similarly, this court in State v. Tamez, 506 So.2d 531, 533 (La.App. 1 Cir. 1987), noted that it is "axiomatic that an interpreter should be a neutral and detached individual."